# WHEELING.

## COLMAN *v.* W. VA. O. & O. L. CO.

Submitted June 13, 1884.—Decided November 22, 1884.

1. If a corporation, which does a large amount of business, from the character of which it must often be required to bring suits and defend suits brought against it, is in its by-laws and action of its board of directors silent as to the duties of its president, and he is left thereby entirely untrammeled, he has as one of the powers inherent in the president of such a corporation authority to take charge of its litigation and to institute and carry on suits for it and in its name and to defend suits brought against it; and in so doing he may employ counsel who may bind the corporation by their action in the suit within the ordinary power of counsel. He has also the inherent power to apply for and obtain a writ of error for the corporation and in its name ; and at his pleasure he may dismiss the counsel employed by him in such case as well as the writ of error, unless restrained from so doing by some action of the board of directors.   (p. 168.)

2. When a vacancy occurs by death in the office of president of a corporation, the vice-president may act in his stead and perform the duties, which devolved on the president, though the law, under which the corporation was organized, did not mention the office of vice-president, but after providing for certain officers authorized the company to create other offices, and it did accordingly create the office of vice-president.   Such a vice-president after the death of the president possesses all the inherent power of the president; and if he had the inherent powers to take charge of the litigation of the corporation and the other inherent powers of a president named in the first point of the syllabus, the vice-president after the president's death may exercise all or any of these powers. (p. 172.)

3. If a judgment be rendered against a party, no creditor of the party, whether he has a lien on his land or not, has a right to obtain a writ of error in the name of the defendant; and if a writ of error is obtained in the name of such defendant, he may at any time dismiss such writ of error with assent of the defendant in error, and no such creditor of the plaintiff in error has a right to object.   (p. 174.)

4. No court on the application of such a creditor and on his showing, that he would be benefited by the reversal of such judgment, can properly enjoin the plaintiff in error from dismissing such writ of error.   (p. 175.)

5. The fact, that the plaintiff in error is a corporation and is insolvent, and that on its application the court had directed the costs of such writ of error to be paid by its receiver out of funds in his hands arising from the renting of the land of such corporation, will not prevent the Appellate Court, before whom such writ of error is pending, from disregarding such injunction and dismissing the writ of error, if the plaintiff in error and the defendant in error have agreed, that it should be dismissed, and the court is asked to do so. (p. 176.)

Statement of the case by GREEN, JUDGE :

This was an action of debt brought by the plaintiff, Charles D. Colman, against the West Virginia Oil and Oil Land Company, a corporation of the State of Michigan, in the circuit court of Ritchie county. The summons was issued November 4, 1875. The debt claimed in it was $9,080.10. An affidavit was made the same day stating that "the nature of the plaintiff's claim was a certain promissory note executed at Monroe, Michigan, dated September 1, 1875, whereby the defendant promised to pay the plaintiff on demand $9,080.10 with interest from date at the rate of ten per cent. per annum ; and that the plaintiff was entitled to recover the full amount specified in this note with interest as therein stated ; and that the defendant is a foreign corporation and a non-resident of West Virginia but that it has and owns property in Ritchie county, West Virginia. On this affidavit the clerk of the circuit court of Ritchie county issued an order of attachment against the estate of the defendant; and the plaintiff suggested, that W. Buchus, Hoffman T. Booth and F. W. Silman were indebted to the defendant, and also had effects of the defendant in their possession. These parties were summoned to answer as garnishees. The attachment was served on November 5, 1875, on a large amount of personal property of the defendant consisting of about a dozen boilers at different oil wells and nearly as many steam engines and more oil tanks with a number of pumps, tubing and mechanical tools of every sort in use in pumping oil, a large number of barrels of oil, office furniture, a large quantity of tubing and other personal property, also 1624½ acres of oil lands described as lying in Ritchie county, West Virginia.

The declaration and the note above described were filed at December Rules, 1875. The summons was served in

Ritchie county on B. S. Compton, the president of the West Virginia Oil and Oil Land Company.

Subsequently another order of attachment was issued and John F. Vinal was summoned as a garnishee. On April 28, 1880, the defendant pleaded *nil debet*, on which issue was joined. It also pleaded payment and the plaintiff replied generally and issue was joined. An amended declaration was filed stating that the note sued on was a contract made and to be executed in Michigan, and by the laws of that State ten per cent. could be lawfully demanded as interest, which demand is made as the interest stipulated for in the note sued upon. This amended declaration was demurred to; and issue joined on the demurrer, and defendant filed the miner pleas as to the declaration, and the like issues were joined. A specification of payments and sets-off were filed amounting to $13,096.25, and counter specifications of sets-off amounting to $32,684.62. Amended sets-off were afterwards filed amounting to $13,348.25. The court overruled the demurrer to the amended declaration. A jury was sworn to try the issues joined, who on November 18, 1881, found a verdict for the plaintiff for $16,513.71, with interest from November 18, 1881. The defendant made a motion for a new trial. On March 10, 1882, the court overruled this motion and rendered judgment for the plaintiff against the defendant for $16,513.71, with interest thereon from November 19, 1881, and his costs about his suit expended.

The trial lasted eighteen days; and it was warmly contested. The defendant took sixteen bills of exceptions. I do not deem it necessary to state what were these exceptions, except that in the sixth exception the substance of all the evidence offered by the plaintiff or by the defendant is set out at length; and among the evidence offered by the defendant was that of C. W. Penny, who testified among other things, as follows: "About September 1875, I was a director of the defendant company, one of the executive committee and vice-president." The record-book of the company, this exception also shows, was produced; and with reference to it the plaintiff as a witness on his own behalf testified: "The book now shown me is the record-book of the defendant company, in which the proceedings of its

stockholders, directors and executive committee have been entered.  I was secretary from July 1873, and might claim I am still, but don't care to."  The plaintiff offered then the proceedings of the executive committee at a meeting held on September 1, 1875, recorded on pages 285 and 286 of said record-book, which was admitted as evidence.  One portion of this entry is as follows: " On motion it was resolved, that this company allow and pay C. W. Penny for his services as vice-president and member of the executive committee a salary of $100.00 per month payable monthly and his expenses when absent from home in lieu of all other compensation, such compensation to commence on and from the first day of July, 1874."

Subsequently the court overruled a motion made to quash the attachment issued in this case and ordered a sale of the attached effects to satisfy the plaintiff's lien on the same for $16,513.71 with interest thereon from November 18, 1881, and the costs of the suit; but it being suggested to the court by a certified decree of the circuit court of the United States for the district of West Virginia in the case of *F. L. B. Mayhew & Co.* v. *The West Virginia Oil and Oil Land Company and others* in equity, that Wm. E. Stevenson had been appointed a receiver of all the property and assetts of the West Virginia Oil and Oil Land Company mentioned in a deed of trust filed in said cause, it was ordered that no order of sale of said attached property shall take place at this time, the court not being fully advised as to the extent and power of this decree; and the hearing of the motion to sell the attached property was continued till the next term.  A copy of the decree is made a part of the order.  It states that on motion of the plaintiff and of parties who have proved debts in the cause it was ordered, that William E. Stevenson be appointed a receiver of all property and assetts of the West Virginia Oil and Oil Land Company mentioned and included in the deed of trust filed in the bill and the rents, issues, and profits thereof; and the agents and officers of the corporation were required to deliver possession of said property to the receiver ; and the tenants in possession of said real estate were required to pay their rent to him ; and such rents, as were paid in oil, he was authorized to sell; and after pay-

ing costs of collecting, receiving and marketing the oils and carrying on the receivership he was to deposit the balance in The First National Bank of Parkersburg. He was to report every thirty days the amount of rent received by him and the disposition of oil received for rent; and the company and all its officers were enjoined from receiving any rent or exercising control over any property named in this deed of trust. What property was named in no manner appears but from the decree, the material parts of which are above stated, we may infer that there was mentioned in it the real estate of the West Virginia Oil and Oil Land Company in Ritchie county and perhaps their rents due or to become due to them in oil or otherwise. Nor does it any where appear what is the date of this deed of trust, no copy of it, so far as the record shows, having been presented to the circuit court of Ritchie county.

To this judgment of the circuit court of Ritchie county and this order refusing to quash the attachment a judge of this Court in vacation awarded a writ of error on February 22, 1883, on the application of the West Virginia Oil and Oil Land Company by its counsel. On March 5, 1884, the defendant in error, Charles D. Colman, appeared in this Court and presented what purported to be a stipulation and agreement signed by himself and C. W. Penny, Vice President of the West Virginia Oil and Oil Land Company, for the dismissal of this cause and asked that an order be entered to that effect, which motion W. S. Sands, Esq. claiming to be of counsel for the plaintiff in error resisted; and for reasons appearing to this Court it was ordered, that the hearing and consideration of said motion be postponed until the 29th of March 1884. When this motion was submitted, the evidence on both sides being filed, it was continued till the next regular term of this Court. At that term on June 13, 1884, this cause was submitted to this Court but not by consent of the defendant in error; and his motion to dismiss the same not having been withdrawn the defendants in this motion presented to this Court the decree of March 31, 1884, of the circuit court of the United States, hereinafter given; but the plaintiff in this motion did not withdraw his motion but did not argue it, though it was argued by the defendants in the motion.

The evidence in favor of the motion to dismiss presented to this Court was as follows:

"*In the Supreme Court of Appeals of West Virginia:*

CHARLES D. COLMAN, Plaintiff below and defendant in error

*v.*

THE WEST VIRGINIA OIL & OIL LAND CO., defendant below and plaintiff in error.

On writ of error to the circuit court of Ritchie.

"It is hereby stipulated and agreed on the part and behalf of the parties in the above entitled cause that the writ of error issued and pending therein be dismissed agreed; and that an order to that effect be entered at the first sitting of this court and this court is hereby requested to grant and cause to be entered such order.

"WEST VIRGINIA OIL & OIL LAND CO.,
*By Charles Penny, Vice-President and acting President and chief executive officer thereof.*

"CHARLES D. COLMAN.

"*Parkersburg, W. Va.,* February 29, 1884."

"STATE OF WEST VIRGINIA, COUNTY OF WOOD, SS:

"Charles W. Penny being duly sworn deposeth and says that he has been a stockholder and a member of the West Virginia Oil and Oil Land Company ever since its organization and that during the past ten years and more he has been one of the directors and the vice-president thereof and a member of the executive committee thereof; that Benjamin S. Compton was for many years the president and chief executive officer of said company; that said Compton as such officer caused the writ of error above mentioned to be sued out; that said Compton departed this life in the month of July last since which time this defendant has as such vice-president been acting president and chief executive officer of said company and as such possesses all the power which was possessed by said Compton and as he is advised and believes full power and authority to dismiss or authorize the dismissal of said writ of error and that he has executed the foregoing stipulation for the dismission thereof and has done so in good faith believeing it to be for the best interest of said company and its stockholders that said writ of error should be now dismissed and further said not.

"C. W. PENNY."

"Subscribed and sworn to before me this 15th day of March, A. D. 1884.

"In testimony whereof I have hereunto set my hand and affixed my official seal in the said county of Wood the day and year last above written.

"C. D. MERRICK,

"*Notary Public of Wood County, W. Va.*"

To this the notarial seal of the notary public is attached.

The evidence on the part of those resisting the motion to dismiss this writ of error consists of the affidavits of Walter S. Sands and W. W. VanWinkle claiming to be the counsel of the plaintiff in error and C. D. Merrick, L. B. Dellicker and C. H. S. Shattuck. The affidavits were regularly taken before a notary public, no one being present to represent the plaintiff in this motion, though he had been duly notified, that these affidavits would be taken, and had filed a protest against their being taken before a notary public the grounds of which protest will be presently stated. The parties claiming to be counsel for those opposing the motion to dismiss this writ of error in this affidavit stated, that in December, 1883, one of them received the following letter from L. L. Johnston who had been for many years past a director in the West Virginia Oil and Oil Land Company:

"MONROE, MICH., December 6, 1883.

" *W. S. Sands, Esq.:*

"MY DEAR SIR:—I have just again heard of an effort to dismiss the appeal in the case of *Colman* v. *West Virginia Oil and Oil Land Company* and write this to say, as a director of that company, I rely on you as the company's attorney in the case, to take proper measures to prevent such dismissal. You must hold the appeal at least until it shall appear by what authority the dismissal is directed. Five of our board oppose it.

"Yours very truly,

L. L. JOHNSTON."

To carry out this instruction, Mr. Sands on March 4, 1884 wrote a letter to the president of this Court informing him, that he and W. W. VanWinkle, his associate counsel in the case, had been served with a notice addressed to them both signed by C. W. Penny as vice-president and chief

executive officer of The West Virginia Oil and Oil Land Company dismissing them as the attorneys of the company. In said letter he says: "Mr. Penny is the vice-president of the company but not its chief executive officer. In neither capacity has he the power or authority either to discharge or employ counsel for the company, and hence both Mr. Van-Winkle and myself repudiate his action in the premises. As counsel for the company in the case we deem it our duty to see that it is not made the victim of fraudulent collusion. We have seen the record-book of the company which is now in Michigan and if about ten day's time is granted to us, if there be any motion to dismiss the writ of error, we can prepare the necessary proof." The motion was made the next day, and this Court granted till March 29, that is twenty-four days, for the parties to prepare the proof. These affidavits were taken between the 20th and 22nd of March, 1884.

It is also stated in the affidavit of Walter S. Sands, that the vice-president of this company, C. W. Penny, at one time in Parkersburg told him that he, Penny, had been requested to dismiss the writ of error in this case, but he had concluded that it would not be right for him to do so; that afterwards, in the latter part of February, Penny told him, that the matter of the dismissal of this writ of error had been the occasion of a considerable correspondence between Colman and Colman's wife and himself; but that the matter was ended, as after consultation with some of the principal stockholders and after talking with Gov. Boreman on the subject he thought, that he had no right to dismiss this writ of error, and if he did so he would subject himself to censure; that not long afterwards, on March 6, he received a letter from Penny or more properly a formal notice dated March 1, 1884, handed to him by Charles D. Merrick. The body of this notice is in the hand writing of Mrs. Colman, the wife of the plaintiff in error, and the signature is in the handwriting of C. W. Penny. This was a notification addressed to both Walter S. Sands and W. W. Van Winkle formally discharging and dismissing them as counsel in this case, and was signed by the West Virginia Oil and Oil Land Company by C. W. Penny, vice-president and acting president and chief executive officer thereof. This notice was filed with Walter S. Sands's affidavit.

In this affidavit Walter S. Sands further states, that he has been counsel for this company in all its business in this State for about seventeen years and from his knowledge of its history and of the laws of Michigan, under which the company was incorporated, "he was satisfied that Mr. Penny as vice-president of said company has not any power to employ counsel, discharge counsel or dismiss the writ of error in this case, as he has attempted to do." The board of directors he states has not acted one way or the other in the proposed dismissal of the counsel, who have been acting as the attorneys of the company in this case, or in the proposed dismissal of this writ of error. W. W. Van Winkle with the record-book before him states, that there never has been any action on this subject by the board of directors as shown by their record-book.

Several decrees of the circuit court of the United States for the District of West Virginia in the case of *F. L. B. Mayhew & Co.* v. *The West Virginia Oil and Oil Land Company and others* before referred to were filed with the affidavits of their attorneys in this case, who were also attorneys in that case. The first of these was a decree rendered in this cause deciding, that the complainants had title to sixteen bonds of the West Virginia Oil and Oil Land Company held by them, and that they and all others holding such bonds named in the proceedings of the cause were entitled to have them paid with interest equally by virtue of the deed of trust filed in the bill; and it was referred to W. W. Van Winkle one of the commissioners to ascertain and report these bonds, and to whom payable; and the West Virginia Oil and Oil Land Company was enjoined from using any of the rents or products of the property mentioned in this deed of trust thereafter, except such as was necessary to pay the actual expenses of carrying on the business. The decree was rendered on September 20, 1879. The next decree was the one appointing a receiver rendered on March 19, 1881, heretofore mentioned.

The next was a decree rendered February 1, 1883, directing the receiver theretofore appointed, W. E. Stevenson, to pay for the printing of the record in the case now before us and the costs and fees of officers in obtaining this writ of error.

The next was a decree rendered March 5, 1884, restraining Charles W. Penny as agent or as the vice president or acting president or chief executive officer from dismissing or in any way interfering with the prosecution of the writ of error now before this Court. This order was served on Charles W. Penny on the 11th day of March, 1884. The injunction was awarded on the petition of Wm. D. Thompson and six other creditors of the West Virginia Oil and Oil Land Company charging that C. W. Penny, the Vice President, was acting fraudulently and merely for a money consideration. The petition, so far as shown by the exhibits filed, was not even sworn to by any one.

The next order in this cause, which was filed as an exhibit with their affidavits, was one appointing Charles W. Shattuck special receiver in lieu of W. E. Stevenson, who had resigned.

There was also filed a petition of Charles D. Colman in said cause filed March 1, 1884, in which he set out the obtaining of his judgment in this case in the circuit court of Ritchie; that it was a lien from the time the attachment was served on all the real and personal estate of the West Virginia Oil and Oil Land Company; that all the personal estate levied on had been spirited away, and nothing was left, out of which his judgment could be paid, except the real estate of said company in Ritchie county, the company being insolvent now, and claiming that he had a lien on the same by virtue of his attachment in this suit from the date of November 6, 1875, as determined by the judgment of the circuit court of Ritchie; and that he was entitled to be paid prior to any of the judgments against said company audited and which were all rendered since the 5th of November, 1875. The petitioner asks that this priority over them be recognized by the Court and for general relief.

A decree was also filed of said court on said motion which was rendered on March 21, 1884, which recited among other things hereinbefore stated this petition of Colman showing the insolvency of said company, and that the court had taken in its custody and keeping the real estate of the West Virginia Oil and Oil Land Company and had held the same continuously by its receiver since March 19, 1881, that

said Colman had prior to that sued out an attachment against said property upon a claim, which said company disputed as being unjust and unfounded; and it appearing further that the lien of said attachment, if perfected, would take precedence of the several creditors petitioners who have invoked the jurisdiction of this court in this cause, and that the court had directed the receiver to pay the costs of a copy of the record in this case of Colman, upon the representation of the then counsel of said company, that this judgment in favor of Colman was unjust and erroneous, and that it ought to be reviewed upon the writ of error, and that said company had no means of prosecuting this writ of error. After these recitals this decree proceeds: "This court is of opinion and doth adjudge that the protection of the property in the hands of the court, with which said company and its officers had been enjoined from interfering, required that the court should not allow the creation of unjust charges as liens against it, and that it should afford to the parties in interest an opportunity to have investigated by competent authority an alleged judgment which the highest court having jurisdiction of the matter had decided was proper to be reviewed. It is ordered, adjudged and decreed that the order of injunction entered by this court on the 5th day of March, 1884, be and the same is hereby continued in full force. And it appearing to the court that the said C. W. Penny has been guilty of a contempt of this court by violating said order of March 5th, 1884, it is further adjudged, ordered and decreed that an attachment do issue to the marshall of this district requiring him to attach C. W. Penny and C. D. Colman and bring each of them personally before this court on the first day of April, 1884, to answer for this contempt by them committed in violating the orders of this court made on the 5th day of March, 1884. It is further ordered that the said Colman and the said Penny be required to show cause on the said 1st day of April, 1884, why the petitions filed in this cause by them respectively on the 1st day of March, 1884, should not be stricken from the records by reason of their said contempts; and that all proceedings upon said petitions and each of them be stayed in the meantime."

And lastly a copy of the decree entered by said court since the 26th of March, 1884, was presented to this Court on June 15, 1884, the motion being then in the hands of this Court for decision. It was entered March 31, 1884, and was as follows: "This day C. D. Colman appeared in the custody of the marshall pursuant to writ of attachment issued in this matter on the 21st day of March, instant, and the court having heard the parties in reference thereto, and the said Colman agreeing that he will not seek without the leave of this court on any stipulation between himself and any officer or officers of the West Virginia Oil and Oil Land Company for the dismissal of the writ of error now pending in the Supreme Court of Appeals of West Virginia in which the said company is plaintiff in error and the said Colman is defendant in error. It is ordered that the said Colman be discharged from custody and that the further hearing of the matters arising upon these proceedings be continued until the next regular term, and that an *alias* writ of attachment do issue directing the marshall of this district to bring the body of C. W. Penny before this court on the first day of the next term of this court to answer for the contempt of the said Penny in the premises."

W. W. Van Winkle in his affidavit says, that as one of the counsel in this case, when it was being tried in the circuit court of Ritchie county, he had in his possession and under his control during the trial the record-book of The West Virginia Oil and Oil Land Company, his client in the case, which was there proven to be the record-book of this company, and he has now the identical book before him and will produce it before this Court, if required. In that book, he says, he finds no direction, resolution or order conferring power upon any of the officers of the company. He finds no election of officers by the board of directors after October 1878, when B. S. Compton was elected President; C. W. Penny, Vice-President; C. H. Jones, Treasurer; C. D. Colman, Secretary, and B. S. Compton, C. D. Colman and C. W. Penny the Executive Committee without any power or duties defined for this committee. He finds pasted in this book on page 307 a paper directed to Norman Loomis signed by B. S. Compton and C. W. Penny, Executive Committee,

notifying Loomis of his appointment as secretary of the company in place of C. D. Colman, resigned, and directing Loomis to call on Colman for the seal, books and papers of the company. On page 309 of the record-book he finds, that at a meeting of the executive committee held March 9, 1881, a resolution was passed removing C. D. Colman as one of such executive committee, and appointing John H. Doyle in his stead. He, the affiant, received this book recently from Loomis, the present secretary. B. S. Compton, the president of the company, died in the month of July, 1883, When this suit was being tried in Ritchie circuit court, C. W. Penny, who was a witness in the case, told the affiant, that C. D. Colman had no claims against the company in this suit; that his claim had been satisfied or more than satisfied at that time; and that there was nothing in this record-book of the company showing any action taken by the board of directors authorizing C. W. Penny or any one else to dismiss the writ of error in this case.

C. D. Merrick in his affidavit simply proves his handing to W. S. Sands the notice signed by C. W. Penny, as vice-president, dismissing him and Van Winkle, as counsel for the company, and that he did this at the request of Penny.

L. B. Dellicker, the clerk of the circuit court of the United States for the district of West Virginia, in his affidavit says, that Charles W. Penny, the vice-president of the West Virginia Oil and Oil Land Company, in the fall of 1883 told him, that he did not believe, that the company owed C. D. Colman anything; that it was a trumped up claim, and that anything the company might have owed him had been paid and settled by B. S. Compton long ago.

C. D. Shattuck, the only other affiant, says, that a few days before March 1, 1884, he heard C. W. Penny say, that C. D. Colman wanted him to dismiss this writ of error in this Court, but he said he would not do it and had refused to do so.

To the taking of these affidavits C. D. Colman objected, and refused to attend or cross-examine, but filed a written protest by an attorney for him, while these affidavits were being taken. He protested for the following reasons:

First. Because Sands and Van Winkle had no right in any way to act in this case, or to take any proceedings therein of any sort.

Second. Because these counsel had been formally dismissed and discharged by the plaintiff in error.

Third. Because he had not sufficient notice of the taking of these affidavits. Notice was served on him in Michigan for the taking of these depositions in Parkersburg but nine days before they were taken.

Fourth. Because the circuit court of the United States for the district of West Virginia had no authority to control or attempt to control the officers and agents of the plaintiff in error, a corporation of the State of Michigan, governed by its laws only as to the duties and powers of its officers and agents, and said court had no authority to authorize Sands and VanWinkle, or either of them to institute any proceedings or to take any action or to be continued in the service of this Michigan corporation.

Fifth. Because the courts of Michigan could alone have jurisdiction to dissolve this corporation.

Sixth. Because the circuit court of the United States had no jurisdiction to interfere in any manner with the application made for the dismissal of this writ of error.

*W. S. Sands* and *W. W. Van Winkle* appeared for plaintiff in error.

*C. D. Colman* for defendant in error.

GREEN, JUDGE:

The first question in this case is : Shall this Court dismiss it as agreed without any enquiry into the merits of the case on the writ of error ? Messrs. Sands and VanWinkle argue, that the case should not be dismissed, and base their argument partly on the assumption, that the evidence clearly shows collusion between the parties making the agreement, and partly on the assumption, that in making, agreeing to and directing this dismissal Penny, the vice-president of the company was acting in bad faith to the company, its stockholders and other creditors and with a view of promoting some personal interest of his own and in violation of the wishes of a majority of the directors. Are they right in this assumption ?

It seems to me that the evidence fails to establish such

collusion and bad faith on the part of Penny.  Of course the presumption in this case, as in all others, is that a party who does an act, which he is authorized to do, does it in good faith, until the contrary is made to appear.  What then is the evidence of bad faith and collusion in this case ?  Penny himself swears, that " he executed this agreement to dismiss this writ of error in good faith, believing it to be for the best interest of the company and its stockholders that the writ should be dismissed."  This would be the presumption of law, and this affidavit of Penny should be regarded as adding very little to this presumption, for if in fact he was in collusion with the defendant, Colman, and acted in bad faith, we should naturally expect such fraudulent person to swear that he acted in good faith.

But does the evidence produced by Sands and Van Winkle establish their allegation that this misconduct of Penny was the result of collusion between him and Colman and in bad faith ?  It seems to me it does not.  What were the circumstances, under which this agreement between Penny, the vice-president of the company, and Colman, the defendant, to dismiss this writ of error was made?  C. D. Colman nearly three years before had recovered judgment in the circuit court of Ritchie county against the company for $16,514.17 with interest and costs after a long and bitter controversy, the trial before the jury lasting eighteen days.  The record shows conclusively, that this judgment was not obtained by any collusion between Colman, the plaintiff, and the West Virginia Oil and Oil Land Company, but on the contrary, that his claim was resisted by the company in every possible way.  The record also shows that Penny, the vice-president of the company, did all he could to defeat this claim, even appearing before the jury as a witness against Colman.

The bitterness of this controversy is shown not only in the length of time its trial occupied, but also by the fact, that the defendant took no less than seventeen exceptions to rulings and decisions of the court.  There is no evidence before us indicating that Penny ever approved of the obtaining of the writ of error in this case.  The writ was obtained from a judge of this Court in vacation on February 22, 1883, upon the application of the West Virginia Oil and Oil Land Com-

pany by their counsel, Sands and VanWinkle, employed by the president of the company; B. S. Compton; but there is no evidence, that Penny was consulted. For all that appears he may have disapproved and may then have thought, as he thinks now, that the interests of the company would not be promoted by prosecuting a writ of error. He may have then and always thought, either that there was no prospect of reversing the judgment of the circuit court, or that even if it were reversed for errors committed by the court in its rulings, the company would in no manner be benefited by such reversal, as he may have thought that on a new trial a like judgment would be rendered in favor of Colman, and that he would then have a lien on all the property of the company real and personal from November 5, 1875, the day the attachment was levied, for he may well have believed, that this Court, though it might possibly reverse the judgment for misrulings of the circuit court during the trial, could not reverse the judgment refusing to quash the attachment. There is no evidence, that these were his views, when the writ of error was applied for; but there is on the other hand no evidence, that these were not his views.

It is true that there is proof by L. B. Dellicker, that in the fall of 1883, Penny told him, that the claim of Colman, on which the judgment was rendered, was a trumped up claim, and that anything the company might have owed him had been paid by Compton. But this was the question tried by the jury; and the claim was set up before the jury, that the whole claim of Colman had been paid, and a great effort was made to prove it; but in the judgment of the jury the company and Penny, its vice-president, failed to prove this to their satisfaction. And though in 1883, Penny still held the same opinion of the claim, yet he might have thought, that on a second trial the company would still be unable to prove it to the satisfaction of the jury, even if a new trial could be obtained from this Court, which could only be obtained, if this Court came to the conclusion, that the court below had erred as a matter of law in its rulings, and not because the jury drew a wrong inference from the facts.

Again, W. W. VanWinkle, one of the parties who object to the dismissal of this writ of error, does say, that during

the trial of this case in the court below Penny told him
that Colman had no claim against the company in this suit,
that his claim had been satisfied and more than satisfied.
This was no doubt Penny's belief then and may be yet his
belief; but does it in any way indicate, that he acts in bad
faith in dismissing this writ of error, if he has the right to
dismiss it? May he not be well satisfied from the former
trial, that he could not disprove to the satisfaction of a jury
the *prima facie* case made out by Colman by his holding the
note of the company for $9,080.10 with ten per cent. interest
from September 1, 1875? He has made the effort once be-
fore a jury to prove what he may believe to be the truth,
but he failed to convince the jury, and may he not well be-
lieve that he cannot strengthen the case of the company on
a new trial, even if he could get one from this Court? Dec-
larations of this character made now do not satisfy me, that
Penny acting in bad faith to the company, of which he was
vice-president, in desiring this writ of error dismissed.

. But there is evidence, which proves, that Penny, shortly
before the motion was made to dismiss this writ of error,
repeatedly said, that he had been urged to agree to dismiss
the writ and had refused to do so. His reasons for having
refused to do so are not generally given ; but W. S. Sands,
one of the parties objecting to the dismissal of this writ of
error, states, that he did assign his reasons to him. In his
affidavit he says :   "In the latter part of February, 1884, he
informed him, that the matter of the dismissal of this writ
of error had been the occasion of considerable correspon-
dence between Colman and his (Colman's) wife and him
(Penny); that the matter was then ended, because after
consultation with some of the principal stockholders of said
company and talking with Governor Boreman upon the
subject he thought he had no right to dismiss the writ, and
his doing so might lay him open to a great deal of adverse
criticism." He does not in this or any of these conversations
pretend to say, that he (Penny,) thought, that it was best for
the interest of the company to prosecute this writ of error.
On the contrary he bases his refusal at that time on a doubt
of his authority used on his being satisfied, from what Gov-
ernor Boreman said, that he had no authority to do so, and

on his belief that, it he did so, he would be subject to much adverse criticism. The fact, that he afterwards agreed to dismiss this writ of error, seems to me to show, not that he had been bribed or otherwise improperly influenced to do so, but rather that he had changed his mind as to his authority to so act, and was willing to subject himself to adverse criticism rather than sacrifice the true interest of the company he represented. This seems to me to be but a charitable view of his conduct.

The only other evidence offered to show collusion between Colman and him or bad faith in this matter on his part is, that the agreement to dismiss this writ of error signed by Colman and by him as vice-president and acting president and chief executive officer of the West Virginia Oil and Oil Land Company was all in the hand writing of the wife of Colman. I can hardly conceive why this proof was taken. It gives rise to no sort of suspicion. It was not unnatural when the parties had agreed to enter into such a stipulation, that the paper should be drawn or copied by the wife of one of the parties. It is obviously totally immaterial by whom the agreement was written or copied, provided it was signed by parties competent to bind the plaintiff in error and the defendant in error.

This is all the evidence relied upon to show bad faith in Penny in this matter, so far as evidence has been taken in the case.

It is said though, that the dismissal of this writ of error would be in opposition to the wishes of a majority of the board of directors of the company. But no sort of proof is offered to sustain this allegation, nothing but a private letter from one of the members of the board of directors to W. S. Sands dated December 6, 1883. This letter states that a majority of the board oppose this dismissal; that there are five members of the board opposed to it. The letter is of course no proper evidence, the contents of it not being sworn to as true. But suppose it was true. The board consisted of nine members, as appears from a document signed by all nine members of the board and on the trial of the case taken from the record-book of the company. Suppose then it was true as stated in this letter that on December 6, 1883, five of

the members of this board were opposed to dismissing this writ of error, and four of them were, as is to be inferred, in favor of dismissing the writ of error. This shows that prior to December 6, 1883, the members of the board of directors had the question under consideration, whether or not this writ of error should be dismissed; and then a bare majority of one out of nine members were opposed to its dismissal. This and the subsequent conversations of Penny with Sands, to which we have referred, show that the proposed dismissal of this writ of error was kept no secret from the members of the board of directors, but that it was freely discussed among them as well as by the principal stockholders of the company.

The agreement to dismiss this writ of error was not actually entered into and signed by the parties for nearly three months after this letter of Johnson's was signed. Is it not perfectly natural to suppose, that some one member, who prior to December 6, 1883, was not willing on his then information to dismiss this writ of error, afterwards on fuller information changed his mind? It needed but one single member to change his mind to make a majority of the board of directors in favor of dismissal. If any majority of the board of directors really continued to disapprove of the dismissal, why has it not been made to appear? If a majority of the board of directors really disapproved of this agreement of the acting president of the company, Penny, and Colman that this writ should be dismissed, why have they not long since met as a board and expressed their disapproval? No one ever questioned the right of a majority of the members of the board of directors of this or of any other corporation, acting as a board, to revoke the authority of its president or acting president, if he claimed such authority, to enter into such an agreement to dismiss a writ of error. They knew that he claimed this authority; for a formal motion, based on this claim of authority and on this agreement, was made to this Court as early as March 5, 1884. The proofs in this motion were filed up to June 13, 1884, more than three months afterwards. Why in all this time did not the board of directors of this company meet and by their action direct this motion to dismiss this writ of error to be withdrawn, and forbid the acting president of the company to dismiss the writ of error?

The power of the board to so act was and is unquestionable. The failure to exercise this power satisfies my mind, that in point of fact a majority of the members of the board of directors of this company since March 1, 1884, have desired this writ of error to be dismissed. But be this as it may, the only way, in which this Court or any one else can legally ascertain, what a board of directors desire in this or any other matter, is by the expression of their wish by some entry on their record-book while in session as a board.

But is is said, that the proceedings in the case of *Francis L. B. Mayhew & Co.* v. *The West Virginia Oil and Oil Land Company and others* in the circuit court of the United States for the District of West Virginia show, that this agreement to dismiss this writ of error was made by Penny by collusion with Colman and in bad faith. But there is nothing whatever in that case, so far as any portions of it has been copied and filed in evidence in this case, which in any degree proves this allegation. It is not asserted or hinted at as a fact, that bad faith in this respect had been proven on the part of Penny; for while the court had issued a process of contempt against him and has in effect forbidden the parties to this agreement to dismiss this suit to carry out the agreement, yet this is not based on any allegation, that Penny as acting president of the company would not inherently possess the power, but upon the ground, as we will presently show, that the board of directors ought to be forbidden to exercise this power as well as its acting president under the circumstances of this case. There is no intimation in any of these decrees, that it has been proven, that Penny is fraudulently colluding with Colman. I suppose, therefore, that there is no proof of this character in that case.

It is true that a petition was filed in this case by W. D. Thompson and half a dozen other creditors of the West Virginia Oil and Oil Land Company, in which it is in substance alleged, that Penny as vice-president of said company has made to one of these creditors the dishonorable proposal, that if he would give to him (Penny) $5,000 out of his claim, he (Penny) would do all he could to prevent any interference with his claim; and that the proposal was declined. This allegation would seem to be foreign to the objects of

this petition and seems to have been intended merely as a slur on the general character of Penny. There are allegations in this petition, somewhat indefinite it is true, which in effect amount to an allegation, that the said Penny and Colman had by collusion and with a view of fixing on the said company this debt of Colman charged to be fraudulent, in bad faith on the part of Penny as such vice-president agreed to dismiss this writ of error; and it asks an injunction to prevent this being carried out. This injunction was granted but not on the ground of the truth of these allegations, there being, so far as any portions of the record in that case, which have been presented to us, show no kind of proof of these charges, the truth of the facts stated in this portion not being sworn to, as is usual in the courts of West Virginia, when a bill or petition is presented asking an injunction based on facts, which are not proven by exhibits or in some other manner. But doubtless this injunction granted in this case, so far as the record before us shows, without any proof of these allegations of bad faith and fraudulent conduct on the part of Penny was granted without even an affidavit to these facts, simply because the court, as I understand its decrees, regarded them as utterly immaterial, and considered that it was the duty of that court to prevent the dismissal of this writ of error, even if the board of directors had unanimously passed a resolution directing the dismissal of the writ.

Before deciding whether or not we should act upon these views let us consider what would have been the power of the president of the West Virginia Oil and Oil Land Company upon the assumption that no special authority whatever had been conferred upon him, as in fact none was. Would he have had a right by virtue of his inherent power as president, if unrestrained by any order or action of the board of directors, to employ counsel to obtain a writ of error in this case; and after it was obtained, could he have discharged the counsel whom he had employed, and dismissed the writ of error? It seems to me that he did possess these powers. It must be admitted, that these inherent powers of presidents of corporations, that is, the powers not derived from the express action of the board of directors or those to be

deduced from the continued exercise by the president with the silent acquiescence of the board of directors, are to a large extent undefined and are quite limited. But it does seem to me, that the decisions do show, that where a bank or any other corporation, which does a large amount of business, from the character of which it must often be required in the regular course of business to bring suits and to defend suits brought against it, is silent as to the duties and powers of its president, and he is entirely unrestrained by any action of the board of directors, it is a duty pertaining to the office of president of such a corporation to take charge of the litigation of the corporation; and that therefore he has the inherent power to institute and carry on legal proceedings for the purpose of collecting debts due to the corporation, and that he may in like manner appear and defend in any suits brought against his corporation. He has an inherent right to employ counsel for his bank either to institute or defend suits. Counsel whom he thus employs can bind the corporation by their action in the case within the ordinary powers of counsel; and this too, even though the circumstances show, that the president acted so improperly in employing the counsel, that he might properly be held responsible for his breach of trust in the employment of counsel. The following authorities sustain, I think, these conclusions : *First National Bank of Wellsburg* v. *Kimberland*, 16 W. Va. 555 ; *Smith* v. *Lawson et al.*, 18 W. Va. 222,229 ; *Hodges Ex'or.* v. *First National Bank of Richmond*, 22 Grat. 58 ; *Savings Bank of Cincinnati* v. *Berton*, 2 Metc. (Ky.) 240 ; *American Insurance Company* v. *Oakley*, 9 Paige 496 ; *Munford* v. *Hawkins*, 5 Denio 355 ; *Alexandria Canal Company* v. *Swann*, 5 How. (U. S.) 83 ; *Chamberlain & Churchhill* v. *Mammoth Mining Company*, 20 Mo. 96.

It is true that in most of these cases the corporation was a bank, and the inherent powers of the president of the bank was the inquiry directly before the court. But in some of these cases the corporations were not banks, and from the reasoning, on which the decisions in these cases were based, it seems to me, that they apply as much to the president of any business corporation, whose business transactions are necessarily large, and who must have much litigation; and this

would include such a corporation as the West Virginia Oil and Oil Land Company. It is true that in the *Ashadot Manufacturing Company* v. *Henry Marsh*, 4 Cush. 507, it was held that the president of that manufacturing company had no inherent authority as such president to institute that suit. But it will be noted that the corporation consisted of but three stockholders, one was the president, another was the clerk, and the third was Henry Marsh, the treasurer, who lived in Wisconsin. The other two stockholders, the president and clerk, lived in different counties in Massachusetts. The corporation in no way authorized Bush to bring this suit, which was brought against its treasurer. The court held in this case, that the president had no authority as such to institute this suit. No reasons were given by the court for its decision and no opinion filed. It seems to me that this decision was right; as I infer that the corporation was not one of large business, or which was likely to have much litigation, but was so very restricted in its operation and consisted of so few stockholders, that it would not come within the principles that I have deduced from the cases before cited.

Messrs. Sands and Van Winkle in their argument assert, that the president of a corporation cannot confess a judgment without the sanction of the board of directors; and they regard the dismissal of the writ of error in this case as the equivalent of a confession of judgment in favor of Colman for $16,513.71, with interest from November 19, 1881, and costs, this being the amount of the judgment in the court below. To sustain this position they refer to *McMurry* v. *St. Louis Oil Manufacturing Company*, 33 Mo. 375. This authority fails to support their position. In that case it was decided that a "judgment confessed by the president of a corporation without the service of process and without order or knowledge of the directors or company, and not setting forth the cause of indebtedness is void." The court assign no reason for this conclusion but simply say they admit it to be true. The argument of counsel in the case on page 383 shows the probable reason of this holding. The law of Missouri forbids a corporation to create a lien on its property. The confession of judgment before an action was brought violated this statute, as it was a creation of a lien by the corporation. If how-

ever the president had after the institution of a suit against the corporation confessed a judgment for the corporation, though he had no authority conferred on him by the board of directors, such confession would have been binding on the corporation, for then the lien on the property would be considered as created by law and not by the voluntary act of the corporation. For the confession of judgment may have been made by the president for the company, because he could not avoid the plaintiff's obtaining a judgment. That the president of a corporation may appear for it, when an action is pending against it and by the inherent power belonging to him as president confess a judgment for the corporation, which will be binding on it, was expressly decided in *Chamberlin* v. *Mammoth Mining Company*, 20 Mo. 96. The reason assigned for this, viz: that he is the proper party, on whom to serve process, does not seem to me sound. The true reason is, that he has the inherent power as president to conduct the litigation of his corporation, provided his corporation is one whose ordinary business gives rise to much litigation, as a bank or such a corporation as the West Virginia Oil and Oil Land Company.

But really there is no similarity between the confession of a judgment by the president of a corporation and the dismissal of a writ of error to a judgment obtained against the corporation. The first is the exercise of a power much greater than the second. If the president has a right to procure a writ of error to be awarded, it would seem to be a matter of course, that he could abandon it and direct its dismissal. This is clearly not the equivalent of a confession of judgment; for when he has the writ of error dismissed, he simply leaves in force a judgment, which may have been obtained, as it was in this case, after a prolonged litigation, in a court of competent jurisdiction, not on confession but on the merits of the case.

The exact question we are now considering, the right of the acting president of the West Virginia Oil and Oil Land Company to dismiss this writ of error, is not precisely covered by any adjudicated case, which I have seen. But if we can deduce from the decision, that the president of such a company as the West Virginia Oil and Oil Land Company has

by virtue of his office the inherent right to manage the litigation of the company, when not forbidden by some action of the board of directors, and can employ counsel to defend suits, and can in his discretion procure a writ of error to a judgment against his company, as I think we can, then it must follow as a matter of course, that he may order the dismissal or consent and agree to the dismissal of the writ of error, without the express assent of the board of directors. But as they could have forbidden him to defend the suit for them, so they can by a resolution of the board prohibit him from dismissing this writ of error. It is obvious that as Compton, the president of the company, died in July 1883, all his powers as president forthwith devolved on Penny, the vice-president; and if Compton had the inherent power as president to dismiss this writ of error, then this power on his death immediately devolved on Perry, the vice-president. This is a proposition so clear that it seems unnecessary to refer to authority to sustain it. But as the case, to which I would refer to sustain this view, otherwise throws light on the case before us, I will cite it.

In *Smith* v. *Smith et al.*, 62 Ill. R. 493, it was decided: "In the absence of legislative enactments or provisions in their by-laws corporations act through their president or those representing him. When an act pertaining to the business of the company is performed by him, it will be presumed the act was legally done and binding upon the company. And as a general rule in the absence of the president, or when a vacancy occurs in the office, the vice-president may act in his stead, and perform the duties which devolve upon the president. In that case the charter did not mention a vice-president as an officer of the company, but after providing for certain officers, it authorized the company to create other officers and the company by its by-laws declared there should be a vice-president and prescribed his duties. Held, that he might perform the duties imposed upon the president in the same manner and under the same circumstances as though his office had been created by the charter."

Messrs. Sands and Van Winkle in their brief allege, that the statute laws of Michigan, under which the West Virginia Oil and Oil Land Company was chartered, provides that the

affairs of the corporation shall be managed by directors, that a corporation can only act in the manner pointed out by the organic law, and that the directors can only act collectively in their official capacity and not as individuals. See *Pennsylvania Lightning Rod Company* v. *Board of Education*, 20 W. Va. 360, and for the statute law of Michigan, vol. 1, ch. 95, sec. 2844, p. 944 of Compiled Laws of Michigan. This section is as follows : " The stock, property and affairs of such corporation shall be managed by not less than three nor more than nine directors as the articles shall determine ; one of whom shall be a resident of the State. They shall hold their offices one year and till their successors are appointed." But the very next section provides : "That the directors of every such corporation shall choose one of their number president, and such other officers as their articles of association and by-laws may require, who shall hold their offices one year, or until others are chosen in their stead."

Now as the articles of association and by-laws of this corporation are not furnished though in the possession of Sands and Van Winkle, the opponents of this motion to dismiss this writ of error, we must presume that under this last section the board of directors not only elected a president but also a vice-president, that these articles of association must have provided for the election of a vice-president. The record-book of the board of directors, it is proven, shows that the last election of officers by this board of directors was held October 16, 1878, when B. S. Compton was elected president and C. W. Penny, vice-president. As Compton died in July 1883, Penny, who was by the statute-laws of Michigan above quoted then vice-president, succeeded to all his rights and duties as president. See *Smith* v. *Smith et al.*, 62 Ill. 493. Among these rights was, as we have seen, a right to dismiss this writ of error ; and, I doubt not, from that time he has entertained the idea that he would exercise this right ; and from that time, till the motion was made to dismiss this writ of error, it was a subject of discussion among the directors and stockholders of this company. There is clearly nothing in the statute-law of Michigan above quoted, which takes from the president of this company, or the vice-presi-

dent, when acting as president, the right, which by the common law he had, to dismiss this writ of error. Certainly the provision that "the affairs of the corporation shall be managed by a board of directors," cannot possibly do so. For the affairs of corporations are everywhere managed by a board of directors; but they act in almost all matters of necessity by their officers and agents; and certainly there is nothing in this statute to prevent this. If it were so construed, it would render it impossible to organize in Michigan any corporation, which could effectively carry on any business.

I propose now to consider whether the proceedings, which have been had in the circuit court of the United States for the district of West Virginia in the case of *F. L. B. Mayhew & Co.*, v. *The West Virginia Oil and Oil Land Company,* have deprived the company or its vice-president, C. W. Penny, of the right to dismiss this writ of error, which they had by the common law. In determining this question we must determine who has a right to sue out this writ of error; for it would seem to follow as a necessary consequence, that he, who had a right to sue out this writ of error, or his representative would necessarily have a right to dismiss it; and consequently that no one, who did not have a right to sue out this writ of error, could have a right to dismiss it, unless he acquired such right directly from some one, who originally possessed it. Now it is an inflexible rule, that no one can sue out a writ of error, who is not a party or privy to the record, or not shown by the record to be prejudiced by the judgment. Bac. Abrid, Error b. Com. Dig. Pleader 3 b. 9. Thus bail can not have a writ of error to reverse the judgment against his principal, nor can the principal sue out a writ of error to reverse a judgment against the bail; and both principal and bail can not unite in prosecuting a writ of error on a judgment against either of them. See *Lancaster* v. *Raleigh,* Cro. Car. 300; *Bushell* v. *Galler*, *Id.* 403; *Smith* v. *James, Id.* 575; *Forrest* v. *Sandland,* Hob. 72. The writ of error must always be brought in the name of and by the party, whose legal right has been affected. See *Jacqueth* v. *Jackson,* 17 Wend. 436.

.These authorities are referred to to show, what I suppose no one could doubt or controvert, that the credi-

tors of the West Virginia Oil and Oil Land Company, whether open contract or judgment creditors, could not have sued out a writ of error in this case in the name of the *West Virginia Oil and Oil Land Company* except with the consent and approbation of the plaintiff in error. No creditor of any one, whether a corporation or an individual, against whom a judgment has been pronounced, has a right in the name of such corporation or individual to prosecute a writ of error. This proposition is so fundamental, that I presume no one will contradict it. To permit my creditor at his pleasure and against my protest to prosecute a writ of error in my name to reverse a judgment would be a novelty, which, I suppose, was never dreamed of as possible. If I choose to sue out a writ of error, I and I alone can do it; and after I have sued out such writ of error, I have a perfect and absolute right to dismiss my writ of error, and no creditor of mine can enjoin me from so doing or dispute my absolute right, though he may believe, that he is indirectly injured by my dismissing such writ of error. He may fancy that, if I should prosecute the writ of error, the judgment against me would be reversed, and thus a lien be removed from my land, which would make his debt safer or perhaps make a subsequent lien of his debt against me on my land good. It may even be that my chances for reversing the judgment against me are so good, and my creditor would be so obviously benefited by such a reversal, that I ought not in good morals to dismiss my writ of error, or at least I ought in good morals, if he would pay the costs, to permit him to prosecute the writ of error in my name. But no one, I presume, would imagine I was under any legal or equitable obligation to continue to prosecute the writ of error; and no court could be found, who would enjoin me from dismissing my writ of error, if I chose; and no appellate court would refuse to permit me to dismiss my writ of error, whenever I chose. My dismissal of it, if it injured my creditor, would be *damnum absque injuria.*

Suppose we add to this case the fact, that after the suit, in which this judgment was obtained against me, on which I obtained this writ of error, had been brought, and a lien on my property obtained by attachment, a creditor of mine had

brought suit in chancery in another court, before this judgment was rendered, whose object was to enforce a lien by a deed of trust in favor of himself and others, which I had given on certain of my property, and that court had years after the institution of the common law suit against me, but before judgment was rendered in it, appointed a receiver to take possession of the land included in the deed of trust, which I had executed, and to collect the rents. These facts would obviously in no way alter the case. I would still be the only person, who could sue out and prosecute a writ of error to the judgments had against me; and my creditors in the chancery case could in no manner prevent me, if I thought proper, from dismissing the writ of error which I was prosecuting to this common law judgment.

Suppose further, that in this chancery suit other creditors of mine, who had obtained judgments afterwards against me petitioned the chancery court to be made parties to the chancery cause, so that they might participate in the proceeds of the sale of my real estate. These creditors could not ask the Appellate Court to refuse to permit me to dismiss the writ of error, if I chose; and if they could not, the chancery court could not properly grant them an injunction prohibiting me from dismissing my writ of error, a motion for which was pending, when the application for such injunction was awarded. Under such a state of things it seems obvious, that the Appellate Court despite the granting of such injunction would nevertheless dismiss my writ of error.

Now if you will substitute for me the West Virginia Oil and Oil Land Company in this supposed case, you will have substantially the case now before us. This suit was instituted November 4, 1875, in the circuit court of Ritchie county by C. D. Colman against the West Virginia Oil and Oil Land Company; and a judgment was rendered in it March 10, 1880, for $16,513.71 with interest from November 19, 1881, and costs, which was secured by the lien of an attachment levied on all the real and personal property of the defendant in Ritchie county, this attachment having been levied November 5, 1875. Several years after the institution of this suit, but when it does not appear, a chancery suit was instituted in the circuit court of the United States for the district

of West Virginia by F. L. B. Mayhew against the West Virginia Oil and Oil Land Company and others. The objectors to the motion to dismiss this writ of error have not presented to this Court a copy of the bill in this cause; but from the various decrees in the cause the objects of the chancery suit would seem to be to enforce by the sale of certain land of the West Virginia Oil and Oil Land Company the payment of a number of bonds, which were secured by a deed of trust on certain land of this company, and to pay out of the proceeds of this land the holders of all the bonds secured by this deed of trust. The plaintiff held sixteen of these bonds and the court on the 26th day of September, 1879, referred the cause to the commissioner to ascertain who held the other bonds; and on March 19, 1881, by a decree appointed a receiver to take possession of the property named in the deed of trust and rent out the real estate and collect the rents and pay the same into a certain bank to his credit as receiver. On February 1, 1883, three weeks before the granting of the writ of error in this case, the court in the chancery cause upon the application of the West Virginia Oil and Oil Land Company made an order directing the receiver to pay out of the funds in his hands the cost of obtaining the writ of error to this judgment of the circuit court of Ritchie in favor of C. D. Colman and the cost of printing the record of this case; and these costs were so paid amounting to $219.00. The court continued to hold the property named in this deed of trust from March 19, 1881, to the 21st day of March, 1884, when it made perpetual a temporary injunction, which it had awarded on March 5, 1884. This injunction had been awarded on the petition of W. D. Thompson and six other creditors having liens on the West Virginia Oil and Oil Land Company subsequent to the lien of Colman for his judgment of $16,513.71 with interest and costs, which lien dated back to November 5, 1875, and restrained Penny from dismissing or in any wise interfering with the prosecution of this writ of error; and in the same decree Sands and Van Winkle were directed to prosecute the writ of error. But before the writ was served, the motion to dismiss the writ of error had been made to this Court.

In this decree of March 21, 1884, the court also adjudges,

that the protection of the property in the hands of the court, with which said company and its officers had been enjoined from interfering, required that the court should not allow the creation of unjust charges or liens against it, and that it should afford to the parties in interest an opportunity to have investigated by competent authority an alleged judgment, which the highest court having jurisdiction of the matter has decided was proper to be reviewed. Upon the principles, which I have laid down, however proper in a mere moral aspect of the case it may be, that the West Virginia Oil and Oil Land Company should under these circumstances permit this writ of error to be prosecuted, yet as these creditors of this company had no right to require this company to prosecute this writ of error, they had no right by their petition to demand of the circuit court of the district of West Virginia, that it should prevent the West Virginia Oil and Oil Land Company from dismissing this writ of error, if the company thought proper so to do; and the fact that that court awarded an injunction prohibiting the dismissal of this writ of error, whether its action was right or wrong, and directing Sands and Van Winkle to prosecute the same, can not modify the case presented, if in our judgment the West Virginia Oil and Oil Land Company has an absolute right to dismiss this writ of error and to forbid Sands and Van Winkle to prosecute it further, as has been done. I can not see, that the fact, that the court at the instance of the West Virginia Oil and Oil Land Company advanced funds in the hands of the receiver in this cause to print the record in this case and enable the West Virginia Oil and Oil Land Company to obtain this writ, can deprive this company of its absolute right to dismiss this writ of error at its pleasure. I can not see how the circuit court of the United States could by this or indeed in any way in such a suit, as is the one pending in that court, acquire a right to appoint persons to prosecute this writ of error against the protest of the plaintiff in error.

There is but one case, that I know of, in which the circuit court of the United States for the district of West Virginia could appoint or direct any one to prosecute a writ of error in the Appellate State Court; and that is where the plaintiff in error is a bankrupt, and the court is proceeding against him

as such, and there has been a judgment in an inferior court against the bankrupt, which the assignee or court thinks should be reversed.   When the bankrupt law was in force, it expressly authorized the assignee to prosecute or defend any suit in the name of the bankrupt, and under this statute he could against the protest of the bankrupt prosecute a writ of error in his name; and the bankrupt could not dismiss the same.   But I know no other case, where the plaintiff in a writ of error could be restrained from dismissing the writ at his pleasure, however certain creditors might conceive themselves to be thereby injured, or however he had procured the money to print the record and to obtain the writ. If the judgment were in his favor, and he yet obtained a writ of error, then he could, I suppose, deprive himself of his right to dismiss his writ of error by transferring the claim to another.   But when he is a defendant, against whom a judgment has been rendered, I know not how he could be deprived of his absolute right to dismiss his writ of error.

In my judgment the writ of error in this case should be dismissed according to the agreement between the plaintiff in error and the defendant in error executed February 29, 1884.

DISMISSED.