# Richmond.

## CHAFFIN v. LYNCH.

### APRIL 14th, 1887.

1. LIBEL—*Anti-duelling act—Construction.*—This act (Code 1873, ch. 145, § 2,) applies to *words written* as well as to *words spoken.*

2. IDEM—*Common law—Statute—Joinder—Malice.*—A publication containing insulting words may be declared on under the statute, though it be libellous at common law. Declaration, showing by proper averments that the words are within the statute, is sufficient. The two causes of action cannot be united in one count. In either case, malice must be alleged. Mere publication is *prima facie* evidence of malice, but the occasion may rebut the presumption.

3. IDEM—*Defamatory publication—Justification.*—To justify publication of defamatory matter, the occasion must be privileged, and must be used *bona fide*, without malice. Whether the occasion be privileged, is a question of law for the court. Whether it has been used *bona fide*, is a question of fact for the jury.

4. IDEM—*Privileged communications.*—One insult cannot be set off against another (*Bourland* v. *Eidson*, 8 Gratt. 27); yet if a man is attacked by another in a newspaper, he may reply. If his reply is not unnecessarily defamatory of his assailant, and is honestly made in self-defense, it will be privileged.

5. IDEM—*Instructions.*—At trial of action for defamation, it is error to give instructions withdrawing from the jury the question whether the publication declared on falls within the protection extended to privileged communications, and telling them to consider the evidence tending to show that defendant made the publication without malice and *bona fide* in self-defense and protection of his own interest, only in mitigation of damages. On the contrary, if the jury, from the evidence, believed that, though the language used was untrue, yet the defendant believed it true, and used it honestly, without malice, in self-defense and reasonable protection of his own interest, it would have been their duty to

find for the defendant ; and they should have been instructed to that effect.

6. IDEM—*Case at bar.*—Here the occasion of the publication declared on was privileged, and the jury should have been instructed to find whether it was used in good faith by the defendant.

Error to judgment of circuit court of city of Richmond, rendered December 18, 1884, in an action of trespass on the case wherein Richard B. Chaffin was defendant, and David H. Lynch was plaintiff. The jury assessed the plaintiff's damages at $1,500. To various rulings at the trial the defendant excepted.

This was an action for the publication of certain words, which were alleged to be insulting and tending to violence and breach of the peace. The action was brought under the statute commonly known as the anti-duelling act, which, as amended, enacts as follows: "All words which, from their usual construction and common acceptation, are construed as insults, and tend to violence and breach of the peace, shall be actionable. No demurrer shall preclude a jury from passing thereon." Code 1873, ch. 145, § 2.

The controversy arose in this way : On the ninth of March, 1884, there appeared in the daily *Dispatch*, a newspaper published in this city, the following communication :

"A FALSE RUMOR ABOUT R. B. CHAFFIN & CO., REAL ESTATE AGENTS, RETIRING FROM BUSINESS.

"RICHMOND, VA., *March* 6, 1884.

"This is to certify that I am from Hillsdale county, Mich.; that I was a correspondent of R. B. Chaffin & Co., and visited Richmond, Va., on Tuesday last, and was met at the railroad depot by a man by the name of Lynch, who represented that he was representing H. L. Staples & Co. I told him I wanted to see R. B. Chaffin & Co. He said

Staples had been a partner, and created the impression upon me that R. B. Chaffin & Co. were out of the real estate business, and thus prevented my going to see said Chaffin & Co. until to-day, when a clerk of said Chaffin informed me they *were* in the business, and invited me to visit their office.

" WILLIAM HARPER.

" Witness: JOHN C. EASLEY."

*" To the Public and our Friends :*

" You will see by reading the above certificate how some agents expect to make sales, by having their clerks occupy the position that our negro hackmen occupy at the depots, and by misrepresentations get our customers and take them to out-of-the-way boarding houses, thus preventing our correspondents from seeing us. Mr. Harper informed us that he was carried nearly to the extreme end of north Tenth street by a clerk of H. L. Staples & Co. to a boarding house, and he then applied to the landlord to know what had become of R. B. Chaffin & Co., but the landlord knew of no such agents in the city. We have employed the best legal talent to bring suit *at once* against H. L. Staples & Co. for damages in the sum of $25,000. We have established an extensive business at great cost, and we wish it distinctly understood that we mean to protect ourselves against all such *sharp* practice.

" Very respectfully,

" R. B. CHAFFIN & Co."

To this Lynch replied, through the columns of the same newspaper, on the eleventh of March, 1884, as follows :

*" To the Public :*

" RICHMOND, VA., *March* 10, 1884, 4:10 P. M.

" On my return to the city of Richmond this afternoon from a business trip (having been absent since Saturday

last) in the country, my attention has been directed to a communication signed R. B. Chaffin & Co., and published in Sunday's *Dispatch*, headed 'A False Rumor about R. B. Chaffin & Co., Real Estate Agents, Retiring from Business.' I pronounce the statement contained in the certificate, signed William Harper, which is published as a part of said card, that I said anything which could create the impression upon the mind of the said Harper that R. B. Chaffin & Co. were out of the real estate business to be utterly and entirely untrue. The intimation in Mr. Chaffin's card that H. L. Staples & Co. have ever required or expected me, as one of their clerks, to occupy the position of a negro hackman, and by misrepresentation get our (their) customers, and take them to out-of-the-way boarding-houses, thus preventing our (their) correspondents from seeing us (them), is a contemptible, cowardly, malicious lie.

" DAVID H. LYNCH."

The next day following, Chaffin published in the same newspaper the following :

" A CARD.

" In reference to a card signed by David H. Lynch, in yesterday's *Dispatch*, I must say to my friends and the public that in consequence of said Lynch's acts of misrepresentation and his known character as a liar, I could not recognize him in the way a gentleman should be recognized. I expect to have Mr. Harper, of Michigan, the gentleman to whom Lynch represented my firm as out of business, to testify in my suit against H. L. Staples & Co., and thus sustain the charge made therein. Any man who was scoundrel enough to have acted as D. H. Lynch was represented to me to have acted, would be unprincipled enough to deny it when charged with it. I desire the public to know I could not,

under any circumstances, notice such a creature as David H. Lynch, whose character is so well known, and did not notice him, except as a clerk of H. L. Staples & Co. You are respectfully asked to read the sworn certificates below.

"Respectfully,

"R. B. CHAFFIN."

The first of the certificates referred to above is signed and sworn to by W. W. Rowe and J. H. Brown, and is to the effect that they are acquainted with Lynch, and would not believe him on oath in respect to a matter in which he was personally interested; and, further, that they had often observed Lynch, at a window opposite the office of R. B. Chaffin & Co., watching the office-door of said Chaffin & Co., and that when customers of the firm would leave the office, he (Lynch) had been known to overtake them on the street, and endeavor to get them to the office of H. L. Staples & Co.

Another certificate is subscribed and sworn to by one W. H. Thompson, and is to the effect that having seen a great deal of the said D. H. Lynch, he could not believe him on oath.

Thereupon Lynch, who is the defendant in error here, commenced the present action against Chaffin. The declaration contains a single count, and alleges that the words used by the defendant in charging the plaintiff, in his published card, with acts of misrepresentation, and as having a known character as a liar, and that he could not be recognized by the defendant as a gentleman, and also that the words used in the certificate of Rowe and Brown, to the effect that they would not believe the plaintiff on oath, etc., were false and libellous, and are such words as are usually construed as insults, and tend to violence and breach of the peace.

The defendant demurred to the declaration, and also

pleaded not guilty; and it was agreed that any evidence, admissible under any proper special plea, might be introduced under the plea of the general issue.

The circuit court overruled the demurrer, and after the evidence had been introduced, the defendant moved the court to give to the jury certain instructions which were offered by him; but the court refused to instruct the jury as requested by the defendant, and gave two instructions of its own. The jury, thereupon, found a verdict for the plaintiff for $1,500 damages; and judgment having been entered on the verdict, the defendant obtained a writ of error and *supersedeas.*

*Guy & Gilliam, Jackson Guy* and *John Lyon,* for the plaintiff in error.

*Edgar Allan* and *T. G. Jackson,* for the defendant in error.

LEWIS, P., (after stating the case), delivered the opinion of the court.

The first question is, whether the declaration is demurrable. It contains but one count, and the demurrer thereto, which the circuit court overruled, was based on two grounds: (1) That the provisions of the statute, under which the action was brought, now contained in the second section of chapter one hundred and forty-five of the Code, 1873, apply only to words *spoken,* and not to words written or printed; and (2), that, if this be not true, then the action is for defamation at common law, and also for insulting words under the statute, which causes of action cannot be properly blended in one count.

The question involved in the first of these propositions was suggested, but not decided, in *Moseley* v. *Moss,* 6 Gratt.

534, and has not been heretofore adjudicated by this court. We, however, entertain no doubt respecting it. The object of the statute, which was originally passed in 1810, was the suppression of what in its preamble is termed "the barbarous custom of duelling"; and to effect its object it contained some very stringent provisions. It declared killing in a duel murder in the first degree; and, moreover, disqualified from holding office under the government of the State all persons who should violate its provisions, either by sending or accepting a challenge to fight a duel. It also prescribed a test-oath; and to provide a remedy for insults which tend to violence and breach of the peace, wherein the common law was deficient, it was enacted by the eighth section, that "all words which, from their usual construction and common acceptation, are considered as insults, and lead to violence and breach of the peace, shall hereafter be actionable, and no plea, exception or demurrer shall be sustained in any court within this Commonwealth to preclude a jury from passing thereon, who are hereby declared to be the sole judges of the damages sustained." 1 Rev. Code (1819), p. 584, sec. 8.

These provisions of the statute so clearly indicated the intention of the legislature, that in *Brooks* v. *Calloway*, 12 Leigh, 466, it was held that in an action under the statute, no plea of justification was admissible. In other words, that for uttering insulting words, no matter whether true or false, there was no justification or excuse; for, said the court, the words "may be true, and their very truth give venom to the sting of insult." It was also held in *Moseley* v. *Moss, supra,* that although evidence tending to prove the truth of the words used was admissible, yet that it could be admitted only in mitigation of damages.

And it would seem to be equally clear, looking to the whole statute and the circumstances under which it was passed, that the intention, in enacting the eighth section,

was to provide a remedy for all insults occasioned by words, either written or spoken. A different conclusion is not fairly warranted by the terms of the act, nor consistent with its object. The language is "*all* words," of the character described, shall be actionable; and it can hardly be supposed that the legislature, in an effort to suppress duelling, intended to make all insulting words actionable, without justification or excuse, if spoken, and not to provide for such words if published to the world in a newspaper. For, as defamatory or insulting words *written* (and the term includes words printed) indicate greater deliberation and malice, and in general are more permanent and extensive in their operation than words spoken, which often proceed from sudden passion, and may be soon forgotten, so are they more wounding to the feelings of the person aggrieved, and consequently more likely to lead to violence and the commission of the offence which was designed to be suppressed.

It is true that written defamation is actionable at common law, and that any writing is libellous which tends to injure the reputation of a person, or to render him odious, contemptible or ridiculous. *Villers* v. *Monsley*, 2 Wils. 403; *Adams* v. *Lawson*, 17 Gratt. 250; 4 Min. Insts. (1st ed.) 382. But if it were conceded that all written words, which are usually construed as insults, are comprehended within the definition of a libel, the fact remains that the remedy at common law was, in the judgment of the legislature, inadequate for the redress of the grievances it had in view. For it is essential, to maintain an action for libel, that the publication complained of be false and malicious, and therefore its truth may be pleaded in bar of the action; and this the legislature meant to forbid in actions under the statute for insults.

If when the injured party sues, said Judge Allen, in *Brooks* v. *Calloway*, he could be " met with a plea of jus-

tification, and his whole life be investigated before an assembled community, his feelings would be doubly outraged. The law which proffers redress for insult would furnish the opportunity of aggravating the outrage, and be itself an insulting mockery." "The insult," he added, " is the ground of action, and that the law considers injurious, whether true or false."

These remarks forcibly show the policy of the legislature in passing the statute as it originally was. And although it has been since amended, and a later statute, now contained in the fiftieth section of chapter one hundred and seventy-two of the Code of 1873, permits the truth of the words declared on to be pleaded in any action for defamation, whether at common law or under the statute, yet that circumstance does not affect the question before us.

The amendment was made, at the revision of 1849, by striking out of the statute so much thereof as provided that *no plea or exception* should preclude a jury from passing on the words complained of; and, in the section of the Code above mentioned, it is provided that "in any action for defamation, the defendant may justify by alleging and proving that the words spoken or written were true." But this does not take away the right, which existed before, to maintain an action like the present, although the effect may be to do away with one of the reasons for originally extending the statute to written insults. Indeed, the statute just quoted would seem to have been passed with reference exclusively to actions for insults; for why enact that the truth of the words may be pleaded in an action for slander, either spoken or written, when the common law already so provided?

And this brings us to consider whether the declaration in the present case is obnoxious to the second objection urged against it. We think it is not. After the usual

averment of the plaintiff's good character and reputation, the declaration sets out the card published by the defendant on the twelfth of March, 1884, which it alleges to be malicious and libellous, and then, referring to the objectionable words therein, avers that they are such as, from their usual construction and common acceptation, are construed as insults, and tend to violence and breach of the peace; by reason whereof, it concludes, the plaintiff has been greatly injured, etc.

This undoubtedly is a good declaration for an insult under the statute. So much of it as follows the common law form of a declaration for libel is mere matter of inducement, and unobjectionable. It is true the publication declared on is alleged to be malicious and libellous; but it is alleged so to be, because of the words therein, particularly mentioned, which are averred to be insulting, etc., in the language of the statute itself. We see no objection to this form of declaring; for although a publication be libellous at common law, yet if it contain insulting words, there is no reason why it may not be declared on under the statute; and the declaration will be good, if it shows by proper averments that the words are within the statute. It will be faulty, however, if a common law and statutory cause of action are blended in one count. *Hogan v. Wilmoth,* 16 Gratt. 80. In the present case, the declaration sets out with sufficient precision a single cause of action, and that under the statute, and therefore the demurrer was rightly overruled.

The next assignment of error is, that the circuit court erred, at the trial, in refusing to instruct the jury as prayed by the defendant, and in giving the instructions which were given to the jury. And here the principal question is, whether the instructions which were given, and those which were refused, correctly propound the law relating to what are called privileged communications.

This question must be decided upon the same principles. which apply to an action for libel or slander at common law; since in action for insults under the statute, no less than in a common law action for defamation, malice is the gist of the action, which must be expressly or substantially alleged.

To insult, says Webster, is " to leap upon; to treat with abuse, insolence or contempt; to commit an indignity upon, as to call a man a liar." So that without malice, which in this connection denotes ill-will, or an intent to injure, or to offend, or to wound the feelings of, another, there can be no insult. Each case must, therefore, be governed by its own circumstances, the chief of which is the *animus* of the defendant in using the words complained of. For it is obvious that some words, which if spoken contemptuously or from ill-will, would be universally construed as insulting and tending to violence and breach of the peace, would, if spoken under other circumstances, be considered as unexceptionable. Even words of praise, spoken ironically, may be intended and accepted as insults, while, on the other hand, many words usually construed as insulting may be used harmlessly and in jest. Hence, to arrive at a just conclusion, the jury must look to the whole case and all its surroundings, and therefore it is enacted that no demurrer shall preclude the jury from passing on the words which form the subject of the action.

It is not always necessary, however, to prove malice expressly. The law infers malice from the unauthorized publication of matter which is insulting or defamatory. The plaintiff, therefore, makes out a *prima facie* case simply by proving the words, whether written or spoken, as laid in the declaration. But the rule is not inflexible. A publication is sometimes justified by the occasion, that is, made under circumstances which rebut the presumption of malice, as, for example, when made in good faith, in the perform-

ance of a duty, legal or moral, and with the honest purpose on the part of the defendant of protecting his own interest. Such instances constitute a recognized exception to the general rule, and make it incumbent on the plaintiff to prove malice in fact.

If, however, malice. be shown, then the defense resting on the occasion of the publication is rebutted; for to make a communication privileged, two things must concur: (1) The occasion must be privileged; and (2) it must be used *bona fide*, and without malice. Therefore, if a communication goes beyond the occasion, and language is used which unnecessarily defames the plaintiff, such language is not considered as having been used in the due performance of a duty, or in the protection of the defendant's interest, and is not privileged. And the same rule applies where the publication is more extensive than the circumstances of the case reasonably require. *Wilson* v. *Collins*, 5 C. & P. 373 (24 Eng. C. L. 367); Odgers, Lib. and Sland. 225, 280 *et seq.*

There are, indeed, some cases in which, upon grounds of public policy, the privilege is absolute, of which words spoken in his place by a member of the legislature, or by a judge on the bench, or a witness on the stand, in the course of a judicial proceeding, are examples. But with this class of cases we are not concerned in the present case.

Whether the occasion is privileged is a question for the court; whether it has been used *bona fide*, is a question for the jury. In an ordinary action for defamation, however, (*i. e.*, not a case of privileged communication), it is error to submit to the jury the question of malice, for that the law implies, though it has been held that evidence of malice may be given to increase the damages. *Bowage* v. *Prosser*, 4 B. & C. 247 (10 Eng. C. L. 321); *Clark* v. *Molyneux*, 3 Q. B. D. 237; *Hamilton* v. *Eno*, 81 N. Y. 116.

The reported cases on the subject of privileged commu-

nications are very numerous, and they show that while the law as to such communications is well settled, its application to particular cases is often attended with difficulty. They also show that the law in this particular was formerly more restricted than at present, the rule having been gradually extended, on the ground that it is to the interest of society that correct information should be obtained as to the character and standing of persons with whom others have business or social relations; so that it is now settled, as laid down by Baron Parke in the leading case of *Toogood* v. *Spyring,* 1 C. M. & R. 181, that a communication honestly made in the performance of a social duty, is no less privileged than one made in self-defense, or in the protection of one's own interest. And a communication made under such circumstances, and without malice, is protected, notwithstanding its imputations be false, or founded upon the most erroneous information. *Coxhead* v. *Richards,* 52 Eng. C. L. 569; *Davies* v. *Snead,* L. R. 5 Q. B. 608; *Blackham* v. *Pugh,* 2 C. B. 611 (52 Eng. C. L. 611); *Coward* v. *Wellington,* 7 C. & P. 531 (32 Eng. C. L. 616); *Todd* v. *Hawkins,* 8 C. & P. 88 (34 Eng. C. L. 304); *Whiteley* v. *Adams,* 109 Eng. C. L. 569; *Clark* v. *Molyneux,* 3 Q. B. D. 237; *Stevens* v. *Sampson,* 5 Exch. D. 53; *Stace* v. *Griffith,* L. R. 2 P. C. 420; *Van Wick* v. *Aspinwall,* 17 N. Y. 190; *Swan* v. *Tappan,* 5 Cush. 104; *Shurtleff* v. *Stevens,* 51 Vt. 501; *Hamilton* v. *Eno,* 81 N. Y. 116; *White* v. *Nicholls,* 3 How. 266; *Garrett* v. *Dickerson,* 19 Md. 418; *Dillard* v. *Collins,* 25 Gratt. 343; *Moore* v. *Butler,* 48 N. H. 161; 6 Rob. Pr. 885, 903; 1 Am. Lead. Cas. marg. p. 168, notes to *Howard* v. *Thompson.*

According to these principles, while it is true that one insult cannot be set off against another, (*Bourland* v. *Eidson,* 8 Gratt. 27,) yet if a man is attacked in a newspaper, he may reply; and if his reply is not unnecessarily defamatory of his assailant, and is honestly made in self-defense,

it will be privileged. The rule, deducible from the authorities, is expressed by a modern text-writer as follows: "Every man has a right to defend his character against false aspersion. It may be said that this is one of the duties that he owes to himself and to his family. Therefore, communications made in fair self-defense are privileged. If I am attacked in a newspaper, I may write to that paper to rebut the charges, and I may at the same time retort upon my assailant, when such retort is a necessary part of my defense, or fairly arises out of the charges he has made against me." Odgers, Lib. and Sland. 228.

In the present case, the defendant contended in the court below that the publication declared on was privileged, and that the jury should be instructed to find for the defendant, if they believed from the evidence that he had acted honestly, without malice, and in the protection of his own interest. The court, however, refused to instruct the jury to that effect, and gave two instructions of its own. The first is as follows:

"The jury are instructed that if they believe that the words complained of in the declaration as published by the defendant in the *Richmond Dispatch*, of March 12, 1884, were such words as from their usual construction and common acceptation are construed as insults, and tend to violence and breach of the peace, they should find for the plaintiff, unless they believe from all the evidence that such words are substantially true, in which event they should find for the defendant."

This instruction is erroneous, and the error consists in this: that it wholly withdraws from the jury the consideration of the question whether the publication declared on falls within the protection which the law extends to privileged communications. Under proper instructions, the jury might have found that although the language used was not true, yet that the defendant in good faith believed

it to be true, and that it was used honestly, without malice, in self-defense, and in the reasonable protection of his own interest; and if the jury had so believed from the evidence, it would have been their duty to have returned a verdict for the defendant. Yet it seems to have been supposed that this question could be considered only in connection with the measure of damages. For the court in its second instruction, after again telling the jury, in effect, that they must find for the plaintiff, if they believed that the words complained of were not true, proceeds further to instruct them, that "if they believed that the defendant had reasonable cause to believe, and did believe, that the words were true, and that he was provoked to the publication thereof by the plaintiff's card in the *Dispatch* of March 11, 1884, and shall further believe that the defendant in publishing such card of March 9, 1884, was actuated, not by malice against the plaintiff, but by an honest desire to protect his business, believing in good faith that the statements made in said card and the accompanying certificate of Mr. Harper were true, then the jury are instructed that in assessing the plaintiff's damages, such belief upon his, the defendant's part, should mitigate the amount of damages."

The theory of these instructions is, that malice is not an essential ingredient in a case arising under the statute, and that if the words complained of be not true, they are not protected, no matter whether the defendant believed they were true, or what were the circumstances under which they were published. We cannot concur in this view.

According to the statute as it originally was, and as it was construed in *Brooks* v. *Calloway* and in *Moseley* v. *Moss*, no plea of justification was admissible in an action under it; and therefore, as we have seen, the defendant was not permitted to plead in bar of the action that the words uttered were true. To change the law, as thus con-

strued, the legislature passed the statute already referred to, permitting the truth of the imputation to be pleaded in any action for defamation. Nor did it stop there. It went further, and amended the statute, giving a remedy for insults by striking out of it the theretofore controlling provision that " no plea or exception " should preclude the jury from passing on the words complained of; thus leaving an action under the statute substantially subject to the same rules in respect to the defense by plea which apply to an action for defamation at common law. And it cannot be doubted that if the statute had been the same as it now is when *Brooks* v. *Calloway* and *Moseley* v. *Moss* were decided, those cases would have been decided the other way, without the help of the statute, subsequently passed, permitting the truth to be pleaded in justification, as it may now be done. And if the truth of the words may be pleaded by virtue of the amendment of the statute itself, so may the defendant show, if he can, that the publication declared on is justified by the circumstances under which it was made. In other words, a communication which would be privileged in an action at common law, will, if made under substantially the same or similar circumstances, be likewise privileged in an action for insults under the statute. For there is nothing to indicate that the legislature intended, when amending the statute, to leave the hands of a defendant tied, and to preclude him, when assailed, from defending himself, or protecting his interest, within the limits prescribed by the common law.

The truth doubtless is, that when the amendment was made the legislature had arrived at the conclusion that, as a means of suppressing duelling, the statute, so far at least as the civil remedy given by it was concerned, was a failure, and therefore determined to permit any plea to be filed in an action under it which is admissible in an action for slander at common law. At all events, such is the

effect of the amended statute. The instructions given in the present case are consequently erroneous.

The facts are, that on the ninth of March, 1884, the defendant published in the *Dispatch* a card, denying "the rumor" that the firm of which he was a member had retired from the real estate business, and imputing misconduct to the agents of H. L. Staples & Co., in that, by misrepresentations and otherwise, they habitually sought to prevent the defendant's correspondents from seeing him or his firm. He also announced his purpose to bring an action at once against H. L. Staples & Co., for damages, saying further that his firm had established an extensive business at great cost, and meant to protect themselves "against all such sharp practice." To this the plaintiff replied, two days thereafter, in the same newspaper, charging the defendant with having published in his card "a contemptible, cowardly, malicious lie."

Now, in this state of things, the defendant was warranted in believing that a twofold duty was imposed upon him, viz.: (1) To defend himself against the disreputable charge made against him; and (2) to protect his interest by preventing, if he could, unfavorable impressions respecting his published statement of alleged grievances, lest such impressions, if formed in the community, might tend to his prejudice upon the trial of his proposed action. Accordingly he published the card which is the subject of the present action, in which he declared that, owing to the plaintiff's "known character as a liar," he could "not recognize him in the way a gentleman should be recognized;" and further, that he expected to sustain the truth of the statements contained in his previous card by the evidence of a competent witness, when his suit against H. L. Staples & Co. was brought to a trial.

Under these circumstances, the occasion of the publication was clearly privileged, and the jury ought to have

been instructed to find for the defendant, if they believed from the evidence that it had not been abused; that is to say, that the defendant had not laid hold of the occasion as a mere color or excuse for gratifying his private malice with impunity, but had honestly and reasonably acted in the performance of a duty, or in the protection of his own interest.

It is needless to say more. To consider *seriatim* the numerous instructions which were offered by the defendant, and refused, would unduly extend this opinion, already too long. The principles applicable to the case are sufficiently indicated by what has been said.

The judgment will therefore be reversed, and the case remanded for a new trial.

JUDGMENT REVERSED.