Staunton.

RAMSAY v. HARRISON.

September 11, 1916.

Absent, Sims, J. *

1.  CHANGE OF VENUE—*Statement of Grounds—Code, Sec. 3316.*—Statutes
    conferring the right to a change of venue are enacted with the view
    of according litigants a fair and impartial trial, and being in further-
    ance of justice should be liberally construed so as not to defeat the
    right, but the affidavits in support of the motion, especially where
    opposed by counter affidavits of disinterested persons, should state
    the facts and circumstances tending to show that a fair and impartial
    trial cannot be had where the case is pending and not the mere belief
    or opinion of the affiants. Less than this is not sufficient under
    section 3316 of the Code, permitting a change of venue for good cause
    shown.

2.  LIBEL AND SLANDER—*Privileged Communications—Violent Language.*—
    Where there is any legal evidence tending to prove that the language
    complained of was disproportioned in strength and violence to the
    occasion, though the occasion was privileged, the questions of malice
    in the use of the words should not be taken from the jury, and it was
    not error in the case at bar to instruct the jury that "strong and vio-
    lent language or insinuations disproportioned to the occasion may
    raise an inference of malice and thus lose the privilege that would
    otherwise attach to it."

3.  INSTRUCTIONS—*Jury Sufficiently Instructed.*—It is not error to refuse to
    give an instruction which is substantially the same as one already
    given.

4.  PRINCIPAL AND AGENT—*Agency—Admissions of Agent.*—In an action
    against the principal it is not error to receive the admissions of an
    alleged agent, tending to establish the agency, when a *prima facie*
    case of connection between the alleged principal and agent has been
    shown. Although the evidence of the agency may be slight, the
    burden is cast upon the principal to rebut it.

5.  EVIDENCE—*Letter of Plaintiff's Wife—Res Gestae.*—Where husband and
    wife are so intimately associated in the transaction out of which the

---

* Case submitted before Judge Sims took his seat.

action arose, that it is impossible to separate them, a letter written by the wife of the plaintiff to the defendant which is not self-serving in its statements but constitutes a part of the *res gestae* is properly admissible in evidence.

6.  APPEAL AND ERROR—*Bills of Exceptions.*—Where the bill of exception does not contain any evidence in support of an objection to evidence made in the trial court, the objection will not be considered in this court.

7.  LIBEL AND SLANDER—*Insulting Words—Damages—Question for Jury.*— In an action of libel the jury is regarded as the best and safest tribunal to determine not only the character of the insulting words but also the measure of damages, and their verdict will not be set aside as excessive unless so disproportionate to the injury, and unreasonable under the circumstances of the case, as to shock the moral sense and raise a presumption that the jury acted under the influence of gross error, partiality, passion, prejudice or corruption.

8.  LIBEL AND SLANDER—*Insulting Words—Damages.*—The law presumes that damages result from the utterance of insulting words made actionable by our statute just as it does where the words uttered are actionable *per se,* and it is not necessary in either case in order to recover to prove actual or pecuniary loss.

9.  LIBEL AND SLANDER—*Damages—Punishment.*—Vindictive, punitive, or exemplary damages are awarded by the jury in their desire to signify their sense of the defendant's conduct by fining him, to a certain extent, and therefor punish him by awarding "smart money" or damages in excess of the amount which would be adequate compen sation for the injury inflicted on the plaintiff's reputation.

Error to a judgment of the Circuit Court of Charles City county in an action of trespass on the case in libel. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The following instructions were given on motion of the plaintiff:

1. The court instructs the jury that though the occasion is privileged, it must be used in good faith and without malice; strong and violent language or insinuations disproportional to the occasion may raise an inference of malice and thus lose the privilege that would otherwise attach to it, and the same is true if

the jury believe from the evidence that the defendant availed herself of the occasion not to protect her interests or the property entrusted to her care but to gratify her ill will and insult the plaintiff, and whether such an inference of malice is to be drawn from the language used, the manner of its publication, or the circumstances under which it was used is a question for the jury.   The question of good faith, belief in the truth of the statements or insinuations, and the existence of actual malice under all the circumstances of the case remains with the jury.

2.    The court instructs the jury that if they believe from the evidence that the defendant wrote and published the communication complained of, and believe further that the same was not written in good faith but with malice, and that the defendant availed herself of the occasion not to protect her interest, or property committed to her care, but to gratify her ill will and insult the plaintiff, and if they further believe that the words complained of were such as from their usual construction and common acceptation are construed as insults and tend to violence and a breach of the peace, they shall find for the plaintiff.

3.    The court instructs the jury that even should they believe from the evidence that the defendant's communication set out in declaration was written and published in good faith, still it is not privileged, and the defendant will not be protected, if they believe from the evidence that it goes beyond the occasion or exigency, and is unnecessarily defamatory of the plaintiff, or was more extensively published than the circumstances of the case required.

4.    The court further instructs the jury that while malice is the gist of this action, and proof that the defendant was actuated by malice in making said

publication is necessary in order to a recovery against her, yet this does not necessarily mean hatred or ill will towards the plaintiff.

5. The court instructs the jury that in determining whether or not the language complained of is insulting and tending to violence and breach of the peace, the words and sentences must be construed in the plain and popular sense in which the rest of the world would naturally understand them; that is, they are to be understood according to their usual construction and common acceptation. The charge or insult need not be in express terms, it may be by an insinuation. It is sufficient if the jury believe from the evidence that the said words and sentences imply a purpose or intention on the part of the plaintiff to commit a crime or which amount to an allegation that if opportunity afford he would commit a crime, or is of a criminal disposition.

6. The court instructs the jury that the law presumes that damages result from the utterance of insulting words, and it is not necessary for the plaintiff to prove either actual or pecuniary loss in order to recover.

7. The court further instructs the jury that, in determining the amount of damages to which the plaintiff may be entitled, if they believe he is entitled to recover under all the instructions, they shall take into consideration all the facts and circumstances of the case as disclosed by the evidence, the nature and character of the charges, the language in which they are expressed and its tendency, the occasion on which they were published, the extent of their circulation, the probable effect upon those to whose attention they came, and their natural and probable effect upon the plaintiff's personal feelings, and his standing in the

community in which he lives; and, if under the other instructions herein he is entitled to recover, they should award him such sum by way of damages as will fairly and adequately compensate him:

1.     For the insult to him, including any pain and mortification and mental suffering inflicted upon him, and

2.     For any injury to his reputation as a man and citizen.

And if the jury believe, from all the evidence in the case, that the acts complained of were influenced by actual malice and a wilful design to injure or oppress the palintiff, he may recover in this action, in addition to such damages as those mentioned above, punitive or exemplary damages; that is to say, that the jury will not be limited in the amount of its verdict, for the plaintiff, to compensation to him for the actual damages sustained as above indicated; they may give him such further damages as they may think right, in view of all the circumstances of the case, as a punishment to the defendant and as a salutary example to others, to deter them from offending in a like manner, but not exceeding $10,000, in determining whether defendant, in publishing and circulating the charges complained of, was influenced by actual malice or a design to injure or oppress the plaintiff, the jury should consider the relation of the parties to each other, the acts of the defendant before and after the publications in question, and all the circumstances surrounding them.

8.     The court instructs the jury that in this case the defendant has filed a plea of justification, that is to say, she has undertaken to prove that the language complained of, its proper inferences, and insinuations therefore are true.

If you believe from the evidence that the defendant has not established the truth of her plea of justification, you may take this fact into consideration in determining whether the defendant has been actuated by malice or not in using and publishing the communication, set out in the declaration.

9.   The court instructs the jury that there is nothing in the anti-duelling law, or any other law which will prevent the plaintiff from recovering in this case, because the defendant is a woman, if they believe he is entitled to recover under the other instructions in this case.

The following are the instructions asked for by the defendant referred to in the opinion of the court:

A.   (As offered.) The court instructs the jury that the letter signed by C. H. Ramsay, P. M., dated August 12, 1913, mentioned in the declaration, was a privileged communication by the defendant for the protection of her property, and the property entrusted to her care, and as such the defendant is not liable in this action, and whether the statements therein contained were true or not, if the jury believe from the evidence that C. H. Ramsay, as postmistress, acting without malice in writing and sending said letter, and for the purpose of protecting her property, and that entrusted to her care, believing the language to be true, then they must find for the defendant.

A.   (As modified and given.) The court instructs the jury that the communication signed by C. H. Ramsay, P. M., dated August 12, 1913, mentioned in the declaration, was a privilege communication by the defendant for the protection of her property, and the property entrusted to her care, and as such the defendant is not liable in this action unless the jury shall believe from the evidence that such privilege occasion has been abused, within the meaning set out in the

other instructions given in this case, and whether the statements therein contained were true or not, if the jury believe from the evidence that C. H. Ramsay, as postmistress acting in good faith, without malice in writing and sending said letter, and for the purpose of protecting her property, and that entrusted to her care, believing the language to be true, then they must find for the defendant.

B. (Refused.) The court instructs the jury that if they shall believe from the evidence that although the language used by the defendant about the plaintiff was not true, yet that the defendant in good faith believed that it was true, and that it was used honestly, without malice, in defense of her property and in the reasonable protection of her interests, that it is their duty to find for the defendant.

C. (Given.) The jury are instructed that although they believe from the evidence that the language complained of as used by the defendant in her letter of August 12, 1913, is not true, yet that the defendant in good faith believed it to be true, and that it was used honestly, without malice, in defense of her property, and in the reasonable protection of her interests, they must find for the defendant.

D. (Given.) The court instructs the jury that the burden of proof is on the plaintiff to prove his case by preponderance of the evidence.

*Henley, Anderson & Hall, Meredith & Cocke,* and *O'Flaherty, Fulton & Byrd,* for the plaintiff in error.

*Smith & Gordon* and *Irving E. Campbell,* for the defendant in error.

CARDWELL, P., delivered the opinion of the court.

This is a writ of error to a judgment of the Circuit Court of Charles City county, rendered in an action brought by Hugh L. Harrison, under section 2897 of the Code (commonly spoken of as the anti-dueling act) to recover of the defendant, Mrs. Clarise H. Ramsay, damages for insulting words.

The damaging words spoken of and concerning the plaintiff by the defendant are charged in his amended declaration to have been unlawfully and maliciously uttered in a letter written by the defendant to him and published to the Commonwealth's attorney of Charles City county, to two justices of the peace of said county, to the Virginia Navigation Company and others, which letter is set out in the declaration and is as follows:

"Westover, Virginia, August 12, 1913.
"H. T. Harrison:

"I am informed upon reliable authority, that for some time past you have frequently, publicly and vehemently declared your intention to break up the post-office at Westover, and that you have also told residents of the county that some breaking up would occur. Furthermore, I have no knowledge as to what violent means you may propose to effect this end; whether by fire, explosives, etc. Therefore, you are hereby notified by me, in my official capacity of post-master of said office, that your presence or appearance, at or near said office, wharf or road, will be viewed with suspicion, and in the light of a menace to my personal safety, and the safety of the post-office building, its patrons or the employees, or the contents of said building, some of which are the property of the U. S. Government. And that you may have no good reason to appear near said office or wharf—owing to the fact

44

that you are on a line of a new rural route for mail delivery—you are also notified that no freight of any kind whatsoever from or for you or members of your household will be received or handled by me or my employees.

"You have already been warned by the Commonwealth's attorney in public court to refrain from trespassing on Westover plantation or annoying its owners; and a copy of this notice is being sent to him; to two justices of the peace; to the Va. Navigation Company, to the Post Office Department, and to the Speaker of the House of Delegates, the Hon. R. E. Byrd.

"C. H. Ramsay, P. M."

It is then averred in the declaration that said written words "are such as, from their usual construction and common acception, are construed as insults, and tend to violence and breach of the peace," and charges that the plaintiff had been injured and damaged $10,000.

The case was tried upon the plea of the general issue, and defendant's special plea of justification No. 2, on which special plea the plaintiff joined issue.

The first assignment of error is to the refusal of the circuit court to order, on motion of the defendant, a change of venue. This motion was upon the ground that the defendant could not have a fair and impartial trial in said court, owing to the fact that there was prejudice against her in that community, and in support of the motion the defendant offered the affidavits of nine citizens of the county, all of which express the opinion that there could not be a fair and impartial trial in said county, owing to prejudice against the defendant in the community, but none of them, with the exception of L. J. Tremper, undertakes to state any fact or circumstance from which their respective con-

clusions are deduced, that a fair and impartial trial could not be had. Tremper stated in his affidavit that he heard Mr. Herbert S. Saunders, a prominent and influential resident of the county of Charles City, residing in the same vicinity with the defendant, say that, "Mrs. Ramsay has never done anything to me, but I hope to influence every G—d——. man I can including the jury," or words to that effect. The only proof of the remark alleged to have been made by Mr. Saunders is contained in this *ex parte* affidavit of Tremper in support of defendant's motion for a change of venue, otherwise it would never have gotten into the record. Tremper, as is shown, was a partisan of the defendant, procured her affidavits, and was an important witness for her, while Mr. Saunders was not a party to the record, was not a witness, and had no connection with the case directly or indirectly; nor is there the slightest evidence that Mr. Saunders approached a single person in the county with reference to the case, much less a juror, actual or prospective. Conceding, therefore, that he was a warm friend of the plaintiff and made the remark in question, it has no sort of connection with or bearing on the case.

Eight citizens of Charles City county made affidavit to the effect that from their knowledge, observation and conversation with others, there was no reason why the defendant could not have a perfectly fair trial in Charles City county of this suit then pending against her. Two of these affiants, A. Harwood and R. Burton Davis, are practicing physicians in the county, and another, R. S. Major, is the clerk of the Circuit Court of Charles City county. After stating that he speaks from his own knowledge, observation and conversations with others, the affidavit of Dr. Davis says: "I certify that, in my judgment, it will be very easy

to get a jury to try this case—who are entirely un-prejudiced towards either side." To the same effect are all of the other affidavits offered by the plaintiff in opposition to the defendant's motion for a change of venue.

The record does not disclose the slightest difficulty in selecting from the first panel of jurors summoned in the case a jury free from all objections. Nor is there a single fact or circumstance appearing in the record tending, in the slightest degree, to show that the jury selected was not fair, impartial and "entirely unpre-judiced towards either side."

Affidavits in support of a motion for a change of venue must state the facts and circumstances from which the conclusion is deduced that a fair and impartial trial cannot be had where the case is pending, and the court must be satisfied from the facts sworn to, and not from conclusions to which the party moving for a change of venue, or his witnesses, may depose—that is, the venue will not be changed for the mere belief of the party or his witnesses that he cannot have a fair trial in the jurisdiction where his case is pending. Facts and circumstances must appear satisfying the court that a fair trial of the case cannot be had where pending.

It is true, as stated in 40 Cyc. 134, "Local prejudice of such a character as to prevent a fair and impartial trial in the county or district where the action is brought is a well recognized ground for a change of venue." And it is also true that statutes conferring the right to a change of venue are enacted with the view of according litigants a fair and impartial trial, and being in furtherance of justice, they should be liberally con-strued so as not to defeat the right; but where, as in the case at bar, the affidavits relied on as supporting the motion for a change of venue state no facts or cir-

cumstances, from which the conclusion could be fairly deduced that a fair and impartial trial could not be had, a change of venue on the ground of local prejudice is properly refused, especially where, as in this case, the affidavits offered in support of the motion are controverted by a large number of counter-affidavits given by totally disinterested citizens of the county to the effect that, upon knowledge and after observations, etc., in the opinion of the affiants, a jury could be obtained from the county having no prejudice or knowledge of the matter in controversy, "entirely unprejudiced towards either side." In such case, the statute—sec. · 3316, Code 1904—which provides that the circuit court wherein a suit is pending may, on motion, etc., and *for good cause shown,* order any such suit removed to another circuit court, has not been complied with and clearly, therefore, the motion of the defendant in this case for a removal of it to another circuit court was rightly refused. *Boswell* v. *Flockheart,* 8 Leigh (35 Va.) 364; *Muller* v. *Bayly,* 21 Gratt. (52 Va.) 521; *Atl. &. D. R. Co.* v. *Reiger,* 95 Va. 418, 28 S. E. 590; *Pittsburg R. Co.* v. *Applegate,* 21 W. Va. 172; *City of Wheeling* v. *Black,* 25 W. Va. 172; *Salem* v. *State,* 89 Ala. 56, 8 South. 66, where it is held that opinions of witnesses *pro* and *con* that a fair trial can or cannot be had, are worthless unless supported by sufficient reasons testified to as facts. See also *People* v. *Bodins,* 7 Hill (N. Y.) 157; *State* v. *Burris,* 4 Har. (Del.) 582; *People* v. *Yoakum,* 53 Cal. 566.

The defendant, it appears, had been for sixteen years prior to the institution of this suit, the owner and occupant of Westover, one of the colonial homes on the James river, while plaintiff owned and lived, the most of his time at least, upon his farm adjoining Westover. For many years Westover was owned by the ancestors

of the plaintiff, and when it was purchased by the defendant she was entertained at the home of. plaintiff's father, at which time plaintiff was but a boy, and from that occasion up to the time defendant went abroad in the spring of 1911, the relations between the plaintiff and the defendant were pleasant and entirely friendly. Just before going abroad defendant 'phoned for plaintiff and his wife to come over and take supper at Westover, which they did, and plaintiff testifying with reference to that visit says: "She" (defendant) "asked me as she was going away to make out the quarterly report to the United States Government for the Westover post-office, of which she was postmaster, as Jack .Wallace, her negro in charge of the office, 'she was afraid was not capable of doing it.' "    Again a night or two later defendant 'phoned plaintiff to come over to Westover, and requested that whenever he went to the Westover wharf (where the post-office is also situated) he would ride through the place and "see the operations of Gus Miles (colored), who then had charge of the farm."    "She then asked me if I would not see to any corrections that were necessary in case Gus was doing anything he should not be doing in my judgment as to the cultivation of crops, etc., if I would not correct him, and that .he would have orders to obey my directions; and I told her I would do so."    On a third occasion defendant 'phoned plaintiff to come to Westover, and speaking of his visit there plaintiff says: "I went around there with my wife, and she (Mrs. Ramsey) asked me if I would not take charge of the place; that the boys (Jack and Bishop Harrold, Mrs. Ramsay's sons by another marriage) were not willing to leave the place in the hands of a darkey— this valuable estate—as the place was on the market; she thought it would be best to have some competent

person there, etc." Mrs. Harrison testifies to the same effect.

Plaintiff consented to comply with defendant's request, and she gave him checks amounting to $900, which he placed to his credit in bank to be disbursed for her in the management of Westover estate, which money was duly expended and accounted for by plaintiff. With reference to staying at Westover while defendant was to be away, plaintiff, corroborated by his wife, says: "She asked us to come there to take charge of the place, saying it was much cooler than my house—and it was—and also asked that we occupy her room on account of its coolness." Mrs. Harrison says: "She (Mrs. Ramsay) made no exception of any room that we should not be in, but the one room she especially spoke of was that we should occupy her bed-room, her own bed-room, and she said on several occasions that it would give her great pleasure to think of us as occupying her bed-room."

Plaintiff had charge of the Westover estate from June 1st to the middle of September, but occupied the house only five weeks, and he, with his family, had not been at Westover many days when they received a cablegram from defendant, who was then in England, "to move out of her room into the Byrd room." A letter from defendant followed which explained "that on account of the respect . . . that her sons held for her that nobody should occupy her room." Plaintiff and his wife are positive in their statement that they were told to occupy defendant's bed-room and not the Byrd room, and they recite facts as to the bed linen, etc., which impressed it on them; but the fact that they did, though innocently, occupy the "royal" bed-chamber, turned, as it would seem, defendant's friendship for plaintiff and his wife into enmity. Other incidents

occurred between the time that the cablegram and letter from England were received by plaintiff and the following October which tended to prove that the feelings of the defendant toward plaintiff and his wife had undergone a very decided change, but we do not deem it necessary to make special mention of them. Suffice it to say in this connection that it appears that plaintiff faithfully carried out his undertaking; that he accounted for all money left in his hands by defendant, and on September 27, 1911, he drew his check for $8.43, payable to defendant's son, "for settlement in full of Westover accounts," which check, however, was not cashed until June 14, 1912, nearly nine months after it was given, and then it had been altered by scratching out the words, "for settlement in full of Westover accounts."

It further appears that plaintiff not only properly disbursed and accounted for the money left with him by defendant, but superintended the working of her corn crop on Westover, the cutting and threshing of the wheat, sold her wheat, her lambs, straw, etc., depositing the proceeds of his sales to her credit in bank, which deposits, fourteen in number, running from May 20 to August 30, aggregated $1,634.41. He also made out for defendant her quarterly post-office report, which it appears was "a rather tedious job," and in fact for three and a half months he neglected his own affairs, giving more than half of his time to those of the defendant.

Plaintiff left Westover some weeks before defendant's return from abroad. After she returned plaintiff might have reasonably expected to hear from her in some way, but she has never written, spoken or 'phoned to him since. She had told plaintiff that he "would be handsomely rewarded for any service rendered,"

but instead he received a letter October 12, 1912, from Mr. Nance, an attorney of Charles City county, saying that "all the statements and papers which he (Mr. Harrison) had furnished Mrs. Ramsay had been turned over to him, not as an attorney, but simply as agent," and that he wanted to adjust them, and stated that he did not see much difference between them. In an interview that followed the letter, between the plaintiff and Nance, attorney, the latter said he was satisfied with plaintiff's explanation of the settlement of accounts between him and the defendant, but said to plaintiff, "I don't think Mrs. Ramsay is going to pay you anything. She thinks the rent of Westover and some lamp chimneys you broke is ample compensation for services rendered."

While the defendant was abroad one of the duties that plaintiff had assumed at her request was to try to sell Westover, and one of the reasons, as it appears, for leaving plaintiff with his family in charge was that they might show and entertain prospective purchasers. Plaintiff had listed Westover with a real estate agency, under instructions from defendant, and after she returned he received a letter from this agency, which he enclosed to her with some comment or suggestions. Before that he had written her a warning about her corn heating in the field, and stating a remedy; but instead of an answer to these letters, or either of them, plaintiff received a letter from defendant's son, dated June 7, 1912, asking "a discontinuance of attempts at communication with his mother," and threatening to take steps against him if he did not.

Plaintiff had been getting his mail at Westover post-office for many years, but in the early part of 1912 he undertook, with his neighbors, to influence the Post-Office Department to establish a rural route through

his neighborhood, and it seems to be quite clear that this was one of the causes of defendant's animosity toward him. The Westover post-office was $3\frac{1}{2}$ miles from plaintiff's residence, a seven mile journey, while the rural route asked and established brought the mail practically to his door, and in testifying in this case he stated that in seeking to have the rural route established, he had no purpose or desire to hurt the Westover post-office. It did close two other post-offices in that section, but left Westover post-office intact, and on May 1, 1912, plaintiff received a letter from defendant's attorney, Mr. Nance, saying, "Mrs. Ramsey writes me that she would like for me to inform you that she would prefer that you get your mail, etc., at some other post-office than Westover." In the fall of 1912, plaintiff, as well as several others, was served with a warrant and arrested for trespassing on the Westover marsh, but plaintiff was acquitted, defendant's own counsel, Mr. Nance, stating to the trial justice that it was more his (Mr. Nance's) own fault than the plaintiff's that he had not been warned to stay off the marsh.

Plaintiff, as it plainly appears, submitted to all of these disagreeable experiences with the defendant quietly and without resentment, while the anger and malice of the defendant toward the plaintiff continued to increase as the time passed, and on August 4, 1913, she wrote him:

"H. T. Harrison: Owing to the difficulty in collecting wharfage dues on freight handled for you, you are hereby informed that a cash payment of twenty-five cents for every box or bundle addressed or belonging to you before delivery thereof will be exacted;" (five cents was the regular charge) "and if such diffiulty continues no freight will be received at West-

over wharf for or from you. A notice to this effect has been sent to the Virginia Navigation Company. C. H. Ramsay, Westover, August 4, 1913."

It is not denied that this was the first intimation whatever plaintiff had of any complaint of him about wharfage, and it does not appear that there was any just cause for complaint indicated in the letter just quoted or testified to in this case. Following this letter, the letter of August 12, 1913, sued on, was written and published as charged in plaintiff's declaration.

At the trial of this cause the court gave nine instructions asked by the plaintiff, numbered respectively 1, 2, 3, 4, 5, 6, 7, 8 and 9, and gave three of the four instructions asked by the defendant, designated "A," "B," "C," and "D," instruction "A" being given as modified by the court and "B" refused. All of the instructions appear in the official report of the case, and we do not deem it necessary to comment *seriatim* upon the objections made to the instructions given for the plaintiff. These instructions embody principles of law which have been repeatedly sanctioned by this court. *Dillard* v. *Collins,* 25 Gratt. (66 Va.) 343; *Chaffin* v. *Lynch,* 83 Va. 116, 1 S. E. 803; s. c. 84 Va. 884, 6 S. E. 474; *Rolland* v. *Batchelder,* 84 Va. 664, 5 S. E. 695; *Strode* v. *Clements,* 96 Va. 553, 19 S. E. 177; *Payne* v. *Tancil,* 98 Va. 262, 35 S. E. 725; *Tyree* v. *Harrison,* 100 Va. 540, 42 S. E. 295; *Brown* v. *N. & W. Ry. Co.,* 100 Va. 619, 42 S. E. 664, 60 L. R. A. 472; *Moss* v. *Harwood,* 112 Va. 584, 46 S. E. 385; *Farley* v. *Thalhimer,* 103 Va. 504, 49 S. E. 644.

The criticism of instruction No. 1 is that the court, having recognized that the communication sued on was privileged, should not have used the words, "strong

and violent language or insinuations disproportionate
to the occasion may raise an inference of malice and
thus lose the privilege that would otherwise attach to
it."

The insertion of this clause in the instruction was
entirely proper, we think, in view of the evidence in
the record, which strongly tended to prove that the
defendant had no reason to suppose that plaintiff
meant by anything with which she charged him to do
her or her property any violence.   Her own witnesses
testify that the breaking up of the Westover post-office
would follow as the result of plaintiff's securing a rural
delivery, or because of bad service at Westover, and
not because of any violence contemplated by him such
as the use of fire or dynamite.   Defendant says:
"Yes, Mr. Butler gave me to understand that he (Har-
rison) said he hoped the post-office would break up;
that he said that was his object in one sense of the word
in trying to start the rural route."   Another of her
witnesses, C. M. Vaiden, had told her that plaintiff
had said "that the service at Westover was bad and
that the boat was irregular, and that he could get no
supplies, and he was going to break up the post-
office."   L. J. Tremper, another of her witnesses, had
told her that plaintiff said, "that his intention was,
when he established that rural route, or took as much
interest in it as he had, was for the purpose of breaking
up Westover post-office," etc.   This information was
given to defendant sometime before she wrote and
published her letter of August 12, 1913, and in sub-
stance was all the information she ever had as to the
threats she charged plaintiff with having made;   and
it was for the jury to say whether this information
afforded her reasonable belief that plaintiff would use,
or intended to use, "fire, explosives" or other violent

means to destroy or injure her property, and to say whether or not defendant was justified in saying in her said letter to plaintiff that "she would view his presence or appearance with suspicion, and in the light of a menace to her personal safety and the safety of her buildings."

In *Tyree* v. *Harrison, supra,* the opinion says: "The question of good faith, belief in the truth of the statement, and the existence of actual malice remain with the jury . . . It is for the court to say what communications are privileged, and for the jury to determine whether the privilege has been abused."

Where there is any legal evidence tending to prove that the language complained of was disproportional in strength and violence to the occasion, though the occasion was privileged, the question of malice in the use of the words should not be taken from the jury. *Farley* v. *Thalhimer, supra.*

The case of *Chaffin* v. *Lynch, supra* (84 Va. 890, 6 S. E. 477), is also in point here, the opinion saying, ". . for although the occasion may be privileged, yet if the communication complained of goes beyond the occasion, and is unnecessarily defamatory of the plaintiff, or is more extensively published than the circumstances of the case reasonably require; in these and in other like cases which might be mentioned as illustrations, the publication is not protected, though the defednant may have honestly believed that in all he did he was discharging a duty. In other words, a man in defending himself, may not with impunity overstep the line of legitimate defense and unnecessarily become an aggressor. And whether, in the language of Baron Parke, above quoted, 'the occasion or exigency' has arisen which imposes a duty upon the defendant is to be determined, not in accordance with

what his honest notions of duty in the premises may have been, but upon all the surrounding circum-stances.''

The instructions given for the plaintiff were entirely applicable to the facts which the evidence in the case tended to prove, have been sanctioned by this court in the cases above cited, to which many more could have been added, and it would, therefore, serve no good purpose to prolong this opinion with a further discussion of them.

Defendant's instruction "B," refused, embodied practically the same proposition of law contained in instruction "A," which was modified and given, and is also practically the same as defendant's instruction "C," given as asked; therefore, instruction "B" was rightly refused.

The amendment to instruction "A" consisted in the insertion, after the words "and as such the defendant is not liable in this action," of the words "unless the jury shall believe from the evidence that such privilege occasion has been abused within the meaning set out in the other instructions given in this case." It is claimed for the defendant that this instruction was taken from the case of *Reusch* v. *Roanoke, &c. Co.*, 91 Va. 534, 22 S. E. 358, and that as no malice was proved in this case which would justify an alteration of the instruction, it was error not to give it as asked.

There was in the first case, as in this, a plea of justi-fication, but the distinguishing feature of the two cases is that, in the first, the opinion of this court says that there was no legal evidence in the record to suggest malice in publishing the letter sued on, while in this case there was much evidence submitted to the jury tending to prove malice in the publication of the letter complained of; and, therefore, we are of opinion that

the trial court did not err in its amendment of the instruction.

The next assignment of error is to the ruling of the court permitting plaintiff's witness F. E. Barnett to testify as to a conversation he had with L. B. Butler, while Butler was acting in the capacity of manager of the Westover wharf, in which conversation Butler, in substance, stated that he had received instructions that Harrison (plaintiff) was not to handle or get any fish on Westover shore, etc. The ground of the objection to this evidence is that there was no proof offered of the agency of Butler to make the remark testified to by Barnett, but the court admitted the evidence upon the ground that as the Westover wharf (which was in charge of Butler) was a shipping place, and fish were shipped from there by fishermen, he (Butler) was the agent of the defendant and could state (as testified by Barnett) that he had been instructed by defendant that plaintiff could not handle or get any fish on Westover shore. Barnett testified also, and it is not denied, that Butler was the agent of the defendant at the wharf "to handle the post-office and freight." In view of this evidence the declaration made by Butler to the witness, Barnett, not relating to a past transaction, but of and in relation to his employment concerning the management of affairs at the Westover wharf and its surroundings, was, we think, admissible in evidence as tending to prove his agency, and also the alleged instructions he had from his principal that the plaintiff was not to receive any fish on the Westover shore. Butler, as a witness for defendant, did not deny his agency for her at the Westover wharf, nor the statement testified to by Barnett, nor did defendant deny the statement of Barnett or any part of it.

"The admissions of an alleged agent tending to establish the agency in an action against the principal, is not error when a *prima facie* case of connection between the alleged principal and agent has been shown."

"Assuming that the evidence may be regarded as slight, it was sufficient, under the circumstances, to cast the burden upon the defendant of rebutting the inferences, if untrue, by other evidence showing the truth." *Mullen* v. *J. J. Quinlan & Co.*, 195 N. Y. 109, 87 N. E. 1078, 24 L. R. A. (N. S.) 511.

The defendant excepted to the admission in evidence, or rather to allowing Mrs. Harrison, wife of the plaintiff, while testifying as a witness for him, to read from a letter written by her to the defendant some time prior to this suit, but the record does not show that any reason whatever was given at the trial for objection to the admission of the letter or allowing Mrs. Harrison to read it or parts of it. Contention is made here that this letter was plainly immaterial and injurious and that while not having any bearing upon the question at issue, "it was introduced manifestly for the purpose of leading the jury to believe that defendant had made unjust complaints *against the witness*, and thereby put the defendant in an unfavorable light before the jury."

It would seem to have been impossible, in the introduction of the evidence before the jury, to separate the plaintiff and his wife in the transactions out of which this action arose. They were both present on each occasion that the defendant asked the plaintiff to take charge of Westover, and it was to Mrs. Harrison that the defendant spoke when she invited or authorized them to occupy her bed-room. The wife as well as the husband was to carry out defendant's instructions, and she necessarily saw the cablegram from the

defendant, "Please do not use my bed-room." Mrs. Harrison testified without objection: "Mrs Ramsey told us that she would tell her servants to come to us—to my husband, on everything to ask his advice," and that "on two occasions at least she prevented the servants from committing great mistakes at Westover." It was to Mrs. Harrison that defendant sent a message "to please not have certain people in the county to come to see her at Westover because they were people Mrs. Ramsey did not like"—giving the names of these people. Mrs. Harrison testified that she wrote in reply to this message, about a month or more before plaintiff with his family went over to Westover, saying, "I had no idea of excluding anybody who were my friends just because I was in Mrs. Ramsey's house. I was not there as a favor to myself, it was a consideration to her, and I considered that I had the right to have whom I pleased, and I told her so in the letter, and if I went I went on those terms." To this letter the defendant made no reply, nor does she deny receiving it.

Mrs. Harrison necessarily knew that Mr. Nance, the agent and attorney for defendant, had complained to her husband of broken lamp chimneys, and said that defendant thought that this item and "the rent of Westover were ample compensation for services rendered" by her husband; and feeling, as she says, that she had been reflected on and misunderstood by the defendant, as much as her husband, she wrote the letter here in question as her "explanation of everything Mrs. Ramsay complained of;" "I felt it was just to me and due to me that Mrs. Ramsay should hear my explanation of things that she was charging me with." This letter from which Mrs. Harrison was permitted to read when testifying was written December

16, 1911, and it could not have been written with any thought of a suit, and was in that light not self-serving, and being distinctly amicable in tone its tendency was to re-establish friendly relations. The letter was mailed and registered, but was returned unopened with the words across the envelope: "No mail from Mrs. Harrison will be accepted or opened by Mrs. Ramsay."

Besides this letter containing no matter or recitals calculated to put the defendant in any more unfavorable light before the jury than other evidence which had been admitted without objection, it was, we think, so connected with the transactions out of which this suit arose as to become a part of the *res gestae*, and admissible in evidence on that ground also.  11 Michie's Dig. Va. & W. Va. Rep. 907-8; *Davis* v. *Frank*, 33 Gratt. (74 Va.) 413, 420.

The ruling of the court admitting evidence to show the exercise of authority by the plaintiff over the servants at Westover is assigned as error; but the bill of exceptions, No. 8, upon which the assignment is based does not contain any evidence showing the exercise of such authority, and, therefore, the assignment will not be further considered.

The remaining assignment of error is to the refusal of the court to set aside the verdict of the jury because the damages assessed to the plaintiff, $2,500, are excessive.

As the learned counsel for the defendant in error suggest, this is an unique case in the judicial history of this State, being an action by a man against a woman for insulting words, but it is not without a precedent of recent date in this court, in which the plaintiff suing under the statute for insulting words was a woman and a recovery in her favor of $3,000 damages was upheld.  *Boyd* v. *Boyd*, 116 Va. 326, 82 S. E  110.

In the case cited the opinion says that while the damages awarded seemed large, "that was a question especially for the jury," and that "the jury is regarded as the best and safest tribunal to determine not only the character of the insulting words, but also the measure of damages." Citing *Corr* v. *Lewis*, 94 Va. 24, 26 S. E. 385. The opinion further says: "In 18 Am. & Eng. Enc. L., p. 1115, it is said, and this statement seems to be fully sustained by the cases cited in the notes, that in cases of libel and slender, 'A verdict of a jury will not be disturbed unless the amount awarded is so grossly disproportionate to the injury and unreasonable under the circumstances of the case as to shock the moral sense and raise a presumption that the jury acted under the influence of gross error, partiality, passion, prejudice, or corruption, or, as it has been said, unless their disregard of proper instructions is apparent upon the record, or strong circumstances of mitigation appear.' "

Stress is laid upon the plaintiff's admission that he was not by the letter he complains of injured or damaged in his reputation among his neighbors. The object of the statute is to prevent the use of insulting words, and in an action under the statute to recover damages by reason of their use, it is not necessary for the plaintiff to prove actual pecuniary loss resulting from the utterance of the insulting words in order that the jury might give punitive damages.

"The law presumes that damages result from the utterance of insulting words made actionable by our statute, just as it does where the words uttered are actionable *per se;* and it is not necessary in either case, in order to recover, to prove actual or pecuniary loss." *Boyd* v. *Boyd, supra,* 18 Am. & Eng. Enc. L., p. 1061, note 6, p. 1062, note 4; Newell on I. & S.,

sec. 988; *Ibid.*, sec. 855, 1011; Odgers on L. & S. (5th°
ed.) 377; *Prince* v. *Brooklyn Daily Eagle*, 16 Misc.
Rep. 186, 57 N. Y. Supp. 250.

In the last cited case the opinion by Gaynor, J.,
says: "A person may be of such high character that
the grossest libel would damage him none; but that
would be no reason for withdrawing his case from the
wholesome, if not necessary, rule in respect of puni-
tive damages. It is in such cases that the rule illus-
trates its chief value and necessity."

In *Blackwell* v. *Landreth*, 90 Va. 748, 19 S. E. 791,
the opinion says: "That it (the slander) has done her
(the plaintiff) no permanent injury in her reputation,
nor her adopted father either, and was stamped out
by the truth coming to light, is no defense for him
(defendant). His injury to this young girl was such
as to entitle her to damages, to examplary damages,
not only on her account, but to punish the offender."
25 Cyc. pp. 490, 531.

"Vindictive, punitive or exemplary damages are
awarded by the jury in their desire to signify their
sense of the defendant's conduct by fining him to a
·certain extent, and therefor punish him by awarding
'smart money' or damages in excess of the amount
which would be adequate compensation for the injury
inflicted on the plaintiff's reputation. In an English
case a letter was sent privately to one person only, on
whom it made no impression, as 'he did not believe a
word contained in it,' but still the jury awarded three
thousand pounds on the ground that 'there must have
been some vindictiveness.' " Howell on L. & S., sec.
990, citing *Adams* v. *Coleridge*, 1 Times L. R. 84.

As observed, the instructions to the jury in this
case fairly and fully submitted it to the jury upon the
facts which the evidence tended to prove, and rightly

directed the jury in their determination of the amount of damages to which the plaintiff might be entitled, if they believed the plaintiff entitled to recover under all the instructions of the court. And it is not contended that the evidence in the case is not sufficient to sustain the finding of the jury that the plaintiff was entitled to a recovery. If anything were lacking beyond the letter of August 12, 1913, sued on, and the evidence to which we have adverted to prove to the satisfaction of the jury that said letter was written and published in hatred and malice on the part of the defendant towards the plaintiff, and wholly without justification, it appears in the evidence given by her before the jury when she took occasion to say: "I don't think Hugh (meaning the plaintiff) realizes what he is doing or what he says. I think Westover and everything connected with it has become an obsession with him, and that if he cannot have it he would be glad to destroy part of it, perhaps, I don't know." And on cross-examination she made the statement that she was afraid of the plaintiff; that she was afraid to have him come on her place; that she was afraid he would set fire to her place and destroy her property; which statements were made without the least evidence in the case to justify them, and in face of the fact that the plaintiff proved by several of the best citizens of his county, "that he was the equal of any man in the county for truth and honesty, and as a law-abiding, peaceful citizen."

"The appellate court will not interfere with the verdict of a jury unless it appears that the verdict was plainly extravagant or excessive. . . . It is not until the result of the deliberations of the jury appears in a form calculated to shock the understanding and implies so dubious conviction of their prejudice and

passion that the courts have found themselves compelled to interfere." *Bishop* v. *Journal Newspaper Co.*, 168 Mass. 327, 47 N. E. 119; *Boyd* v. *Boyd, supra.*

Upon the facts proven in this case, the verdict of the jury assessing plaintiff's damages at $2,500, cannot be considered extravagant or excessive, but on the contrary is, we think, conservative and just.

It follows that we are of opinion that the judgment of the circuit court complained of is without error, and it is, therefore, affirmed.

*Affirmed.*